# 24-10633

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

### UNITED STATES OF AMERICA,
Plaintiff-Appellee

v.

### JAMAION WILSON,
Defendant-Appellant

---

On Appeal from the United States District Court
For the Northern District of Texas
Fort Worth Division
District Court No. 4:24-CR-027-P

---

### APPELLEE'S BRIEF

---

Chad E. Meacham
Acting United States Attorney

Lindsey D. Pryor
Assistant United States Attorney
Texas State Bar No. 24099182
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8822
lindsey.pryor@usdoj.gov

Attorneys for Appellee

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary. One of the issues on appeal—whether the district court plainly erred in applying the cross-reference to second-degree murder under USSG § 2A1.2 when surveillance video showed the defendant gunning down the victim in a parking lot—fails all four prongs of plain-error review. The second issue is a constitutional challenge to 18 U.S.C.§ 922(o) that is foreclosed by this Court's precedent. As such, oral argument is unlikely to aid the Court in resolving this appeal.

# <u>TABLE OF CONTENTS</u>

Page

STATEMENT REGARDING ORAL ARGUMENT.....................................i

TABLE OF AUTHORITIES ........................................................ iv

STATEMENT OF JURISDICTION............................................. iv

STATEMENT OF THE ISSUES ................................................. 1

STATEMENT OF THE CASE ..................................................... 2

      1.     Wilson kills D.J. in a gas station parking lot and pleads guilty to illegally possessing a machinegun ............................................... 2

      2.     The district court applies the cross-referenced guideline to second degree murder and sentences Wilson to 120 months imprisonment .............................................................. 3

SUMMARY OF THE ARGUMENT............................................. 6

ARGUMENT AND AUTHORITIES........................................... 7

      1.     The district court did not plainly err in applying the cross-reference to second-degree murder under Section 2A1.2...... 7

            A.     The district court did not err, let alone clearly or obviously so ................................................. 8

            B.     Wilson cannot meet his burden to prove the third and fourth prongs of plain-error review ................................. 16

      2.     Wilson's constitutional challenge to Section 922(o) is foreclosed by binding precedent and, in any event, is meritless................... 19

            A.     This Court's precedent holds that machineguns are not arms protected under the Second Amendment, foreclosing Wilson's challenge......................................... 19

            B.     Even if not foreclosed, Wilson's claim fails on the merits.. 21

i.  The Second Amendment does not protect
    machineguns ......................................................... 22

ii. Section 922(o) is consistent with the historical
    principle that the government may ban dangerous
    and unusual weapons............................................. 27

CONCLUSION............................................................................. 36

CERTIFICATE OF COMPLIANCE ......................................................... 36

# <u>TABLE OF AUTHORITIES</u>

**Federal Cases**                                                    **Page(s)**

*United States v. Collins,* 690 F.2d 431 (5th Cir. 1982)......................................14

*Frascarelli v. United States Parole Commission,* 857 F.3d 701 (5th Cir. 2017) . 13, 14

*United States v. Bell,* 2023 WL 7549508 (5th Cir. Nov. 13, 2023)....................11

*United States v. White,* 2024 WL 4987350 (5th Cir. Dec. 5, 2024)..............10, 11

*Bezet v. United States,* 714 F. App'x 336 (5th Cir. 2017) .................................20

*District of Columbia v. Heller,* 554 U.S. 570 (2008)....................................*passim*

*Friedman v. City of Highland Park,* 136 S. Ct. 447 (2015)................................24

*Hamblen v. United States,* 591 F.3d 471 (6th Cir. 2009) ..................................23

*Hollis v. Lynch,* 827 F.3d 436 (5th Cir. 2016) ................................19, 20, 23, 25

*Lara v. United States Parole Comm'n,* 990 F.2d 839 (5th Cir. 1993) .................14

*McDonald v. City of Chicago,* 561 U.S. 742 (2010) .........................................21

*Molina-Martinez v. United States,* 578 U.S. 189 (2016) ...............................16, 17

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1 (2022)...................*passim*

*Puckett v. United States,* 556 U.S. 129 (2009) ..............................................7, 8

*Rocky Mountain Gun Owners v. Polis,* 121 F.4th 96 (10th Cir. 2024) ...........23, 24

*United States v. Alcantar,* 733 F.3d 143 (5th Cir. 2013) ..............................20, 21

*United States v. Bishop,* 603 F.3d 279 (5th Cir. 2010)......................................15

*United States v. Blankenship,* 2024 WL 640148 (5th Cir. Feb. 15, 2024)...........13

*United States v. Brooks,* 33 F.4th 734 (5th Cir. 2022) ........................................8

**Federal Cases, continued**                                                 **Page(s)**

*United States v. Browner*, 889 F.2d 549 (5th Cir. 1989) ................................... 12

*United States v. Caston*, 851 F. App'x 557 (6th Cir. 2021) .............................. 11

*United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024) ...................................... 19

*United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008).................................... 23

*United States v. Forbito*, 2023 WL 8274528 (5th Cir. Nov. 30, 2023)..........17, 18

*United States v. Harrelson*, 766 F.2d 186 (5th Cir. 1985)................................... 9

*United States v. Henry*, 688 F.3d 637 (9th Cir. 2012) ................................23, 24

*United States v. Hicks*, 389 F.3d 514 (5th Cir. 2004) ............................. 9, 10, 11

*United States v. Jones*, 873 F.3d 482 (5th Cir. 2017)....................................... 13

*United States v. Kenney*, 91 F.3d 884 (7th Cir. 1996) ...................................... 33

*United States v. McGavitt*, 28 F.4th 571 (5th Cir. 2022).................................. 15

*United States v. Miller*, 307 U.S. 174 (1939) ................................................. 22

*United States v. Munoz*, 523 F. App'x 278 (5th Cir. 2013)............................... 11

*United States v. Nino-Carreon*, 910 F.3d 194 (5th Cir. 2018) ........................... 16

*United States v. O'Brien*, 560 U.S. 218 (2010)................................................ 23

*United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*,
    822 F.3d 136 (3rd Cir. 2016) .................................................................. 23

*United States v. Ovalle*, 2024 WL 4678881 (5th Cir. Nov. 5, 2024).............21, 35

*United States v. Parra*, 111 F.4th 651 (5th Cir. 2024) ..................................... 17

*United States v. Rahimi*, 602 U.S. 680 (2024)............................................*passim*

**Federal Cases, continued**                                                                **Page(s)**

*United States v. Randall*, 924 F.3d 790 (5th Cir. 2019) ..................................... 18

*United States v. Santiago*, 96 F.4th 834 (5th Cir. 2024) ..................................... 8

*United States v. Walter*, 775 F. App'x 25 (2d Cir. 2019) .................................. 14

*United States v. Williams*, 841 F. App'x 686 (5th Cir. 2021) ............................ 18

*United States v. Zaleski*, 489 F. App'x 474 (2d Cir. 2012) ................................ 23

*Winfield v. Dorethy*, 956 F.3d 442 (7th Cir. 2020) ........................................... 11

## Federal Statutes and Rules

18 U.S.C. 1291 ..................................................................................................... 1

18 U.S.C. § 922(o)(2)(A) ................................................................................... 33

18 U.S.C. § 922(o)(2)(B) .................................................................................... 33

18 U.S.C. § 1111(a) ....................................................................................... 4, 8, 12

18 U.S.C. § 1112(a) ......................................................................................... 8, 12

18 U.S.C. § 3231 .................................................................................................. 1

26 U.S.C. § 5811(a) ........................................................................................... 33

26 U.S.C. § 5845(b) ........................................................................................... 19

26 U.S.C. §§ 5801-5802, 5811-5812, 5821-5822, 5841-5842, 5845(a)-(b) ........ 32

Fed. R. App. P. 4(b) ............................................................................................. 1

**Federal Sentencing Guidelines**                                    **Page(s)**

USSG § 2K2.1(c)(1) ........................................................................ 8

USSG § 2K2.1(c)(1)(B) ............................................................... 3, 8

USSG § 5G1.1(a) .......................................................................... 4

**Other Authorities**

1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756).. 28

1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716) ................. 28

4 William Blackstone, *Commentaries on the Laws of England* 148-49
    (10th ed. 1787) ........................................................................ 28

An Act Against Wearing Swords, &c., ch. 9,
    *in* Aaron Leaming & Jacob Spicer, *Grants, Concessions, and Original
    Constitutions of the Province of New Jersey* 289-90 (2d ed. 1881) ........................ 30

ATF, Current Processing Times,
    https://www.atf.gov/resource- center/current-processing-times
    (as of February 1, 2025) ........................................................... 27

Boise State Public Radio, *Automatic weapons are legal, but it takes a lot to get one of
    the 630,000 in the U.S.* (Dec. 21, 2018),
    https://www.boisestatepublicradio.org/news/2018-12-21/automatic-
    weapons-are-legal-but-it-takes-a-lot-to-get-one-of-the-630-000-in-the-u-s
    (interviewing a collector with more than 20 machineguns) ........................ 26

Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22- 24
    (2d ed. 1792) (N.H.) ................................................................. 29

James Parker, *Conductor Generalis* 12 (1764) (N.J.) ........................................ 29

James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.).... 29

James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).. 29

**Other Authorities, continued**                                    **Page(s)**

John Berrigan, et al., *The Number and Type of Private Firearms in the United States*,
Annals of the American Academy of Political and Social Science, Vol. 704,
Issue 1, at 82 (Nov. 2022) (estimate of 326 million in 2019)....................... 26

Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer*,
12-13 (1773) (Mass.)................................................................................. 29

*National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways &
Means*, 73d Cong. at 6, 12, 22
(statement of Attorney General Homer Cummings).............................32-33

Oliver Krawczyk, *Dangerous and Unusual: How an Expanding National Firearms
Act Will Spell Its Own Demise*, 127 Dickinson L. Rev. 273, 285 (2022).......... 27

Pew Research Center, Key facts about Americans and guns,
https://www.pewresearch.org/short-reads/2024/07/24/key-facts-about-
americans-and-guns/ ................................................................................ 26

Randolph Roth, *Why Guns Are and Are Not the Problem,
in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of
History in Contemporary Debates on the Second Amendment* 117 (2019) ............. 34

Robert J. Spitzer, *Understanding Gun Law History After Bruen: Moving
Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 60-63 (2023) ...........31, 35

Small Arms Survey, Estimating Global Civilian-Held Firearms Numbers,
at 4 (June 2018), https://www.smallarmssurvey.org/sites/default/
files/resources/SAS-BP-Civilian-Firearms-Numbers.pdf
(estimate of 393 million) .......................................................................... 26

The Trace, *How Many Guns are Circulating in the U.S.?*,
https://www.thetrace.org/2023/03/guns-america-data-atf-total/
(estimate of 494 million)........................................................................... 26

U.S. Census Bureau, Happy New Year 2024!,
https://www.census.gov/library/stories/2023/12/happy-new-year-2024.html
(estimating a population of 335,893,238).................................................... 26

W. Kip Viscusi & Kyle J. Blasinsky, *Leveraging Public Support for Gun Laws to
Reduce Mass Shootings*, 2024 U. Ill. L. Rev. 707, 755 (2024)........................... 32

**Other Authorities, continued**                                    **Page(s)**

William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.) .................. 29

Act of Nov. 1, 1692, ch. 18, § 6,
  *in* 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869) ............ 29

Act of June 14, 1701, ch. 7,
  in 1 Laws of New Hampshire 679 (Albert Stillman Batchellor ed., 1904) ... 29

Act of December 21, 1771, ch. 540, § 10, 1771 N.J. Laws 346 ...................... 31

Act of Nov. 27, 1786, ch. 21,
  *in A Collection of all such Acts of the General Assembly of Virginia, of a Public and
  Permanent Nature, as are now in Force* 33 (1794) ............................................. 29

Act of Jan. 29, 1795, ch. 2, 1795 Mass. Acts 436 ........................................... 29

Act of Dec. 25, 1837, § 1, 1837 Ga. Laws 90 ................................................. 30

Act of Jan. 27, 1838, ch. 137, § 1, 1838 Tenn. Pub. Acts 200 ......................... 30

Act of Feb. 2, 1838, ch. 101, § 1, 1838 Va. Acts 76 ....................................... 30

Act of Jan. 6, 1841, Penal Code, ch. 7, § 4, 1840 Ala. Laws 148-49 ............. 30

Act of Apr. 7, 1849, ch. 278, § 2, 1849 N.Y. Laws 404 ................................. 31

Act of Nov. 12, 1849, No. 36, § 2, 1849 Vt. Acts 26 ...................................... 31

Act of Mar. 6, 1852, § 103, 1851 Utah Laws 137 ........................................... 31

Act of Mar. 14, 1855, No. 120, § 115, 1855 La. Acts 148 .............................. 30

Act of Mar. 18, 1859, § 1, 1859 Ohio Laws 56-57 ......................................... 30

Act of Feb. 23, 1859, ch. 78, § 1, 1859 Ind. Laws 129 ................................... 30

Act of Mar. 1, 1864, ch. 128, § 1, 1864 Cal. Stat. 115 ................................... 30

**Other Authorities, continued**                                      **Page(s)**

Act of Aug. 6, 1868, No. 13, ch. 1637, ch. 7, § 11, 1868 Fla. Laws 95 ............ 31

Act of Feb. 25, 1869, ch. 33, § 1, 1869 Wis. Laws 35 ..................................... 31

Act of Feb. 27, 1869, ch. 39, § 1, 1869 Minn. Laws 50-51 ............................. 31

Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws 25 ............................ 30

Act of Feb. 15, 1872, ch. 7, § 1, 1872 Wis. Laws 17 ...................................... 30

Act of Dec. 27, 1873, ch. 226, § 168, 1872 W. Va. Acts 709 .......................... 30

Act of Mar. 4, 1873, ch. 58, pt. 1, ch. 4, § 25, 1873 Neb. Laws 724 ............... 30

Act of Feb. 16, 1875, § 1, 1875 Ark. Acts 156-57 ..................................... 30, 31

Act of Apr. 22, 1875, No. 97, § 1, 1875 Mich. Pub. Acts 136 ........................ 31

Act of Feb. 28, 1878, ch. 46, § 1, 1878 Miss. Laws 175 ................................. 30

Act of May 24, 1879, § 1, 1879 Ill. Laws 114-15 ........................................... 30

Act of Mar. 5, 1879, ch. 127, § 1, 1879 N.C. Laws 231 ................................. 30

Act of Dec. 24, 1880, No. 362, § 1, 1880 S.C. Acts 447-48 ........................... 30

Act of Feb. 1, 1881, § 1, 1881 Colo. Laws 74 ................................................ 30

Act of Apr. 1, 1881, ch. 96, § 1, 1881 Ark. Acts 191-92 ................................ 30

Act of Apr. 16, 1881, § 1, 1881 Ill. Laws 73 .................................................. 31

Act of April 16, 1881, § 4, 1881 Ill. Laws 74 ................................................. 30

Act of Mar. 14, 1882, ch. 219, § 1, 1881 Va. Acts 233 .................................. 30

Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421 ........................ 30, 31

**Other Authorities, continued**                                          **Page(s)**

Act of Nov. 25, 1884, No. 76, § 1, 1884 Vt. Acts. 74-75 ................................. 31

Act of Feb. 18, 1885, § 1, 1885 Or. Laws 33 .................................................. 30

Act of Apr. 7, 1886, ch. 375, § 1, 1886 Md. Laws 602 ................................... 30

Act of May 31, 1887, No. 129, § 1, 1887 Mich. Pub. Acts 144 ...................... 30

Act of May 3, 1893, ch. 1180, § 1, 1893 R.I. Pub. Laws 231-32 ................ 30, 31

Act of June 2, 1893, ch. 4124, § 1, 1893 Fla. Laws 51 ................................... 30

Act of Mar. 8, 1909, ch. 240, § 22, 1909 S.D. Laws 450 ................................ 31

Act of Mar. 22, 1909, ch. 249, § 2661909 Wash. Laws 973 ........................... 31

Act of Feb. 14, 1913, No. 201, § 16, 1912 Vt. Acts 260-61 ............................ 31

Act of Apr. 1, 1913, ch. 186, § 1, 1913 N.J. Laws 339 ................................... 31

Act of Apr. 21, 1915, ch. 133, § 17,1915 N.H. Laws 180-81 .......................... 31

Act of July 7, 1921, ch. 530, § 1, 1921 Wis. Laws 870 .................................. 31

Act of Feb. 11, 1925, ch. 31, § 1, 1925 Or. Laws 42 ...................................... 31

Act of Feb. 25, 1931, No. 58, § 1, 1931 S.C. Acts 78 ..................................... 31

Act of June 16, 1931, No. 327, § 236, 1931 Mich. Pub. Acts 671 ................... 31

Act of May 25, 1911, ch. 195, § 1, 1911 N.Y. Laws 442 ................................. 31

Act of June 5, 1925, ch. 3, 1925 W. Va. Acts 24-32 ...................................... 32

Act of May 16, 1927, ch. 552, § 1, 1927 Cal. Stat. 938 .................................. 32

Act of Mar. 19, 1927, ch. 95, § 2, 1927 N.J. Laws 181 ................................... 32

## Other Authorities, continued

Act of Mar. 9, 1927, ch. 156, § 1, 1927 Ind. Acts 469 .................................... 32

Act of Apr. 19, 1927, ch. 234, § 1, 1927 Iowa Acts 201 ................................. 32

Act of Apr. 22, 1927, ch. 1052, § 4, 1927 R.I. Pub. Laws 257 ........................ 32

Act of Apr. 27, 1927, ch. 326, § 1, 1927 Mass. Acts 413-14 ........................... 32

Act of June 2, 1927, No. 372, § 3, 1927 Mich. Pub. Acts 888-89.................... 32

Act of May 28, 1929, ch. 132, § 1, 1929 Wis. Laws 157................................. 32

Act of Apr. 25, 1929, No. 329, § 2, 1929 Pa. Laws 777 ................................. 32

Act of Apr. 29, 1929, ch. 190, § 1, 1929 Neb. Laws 674................................ 32

Act of June 1, 1929, H.B. 498, § 1, 1929 Mo. Laws 170 ................................ 32

Act of Feb. 25, 1931, ch. 249, § 1, 1931 Del. Laws 813................................. 32

Act of Mar. 9, 1931, ch. 178, § 2, 1931 N.D. Laws 306................................. 32

Act of Apr. 15, 1931, ch. 435, § 1, 1931 N.Y. Laws 1033.............................. 32

Act of July 2, 1931, § 2, 1931 Ill. Laws 452-53 ............................................ 32

Act of July 7, 1932, No. 80, § 2, 1932 La. Acts 337 ...................................... 32

Act of Feb. 28, 1933, ch. 206, §§ 1-5, 1933 S.D. Laws 245-46 ....................... 32

Act of Mar. 6, 1933, ch. 64, § 1, 1933 Wash. Laws 335................................. 32

Act of Mar. 10, 1933, ch. 315, § 3, 1933 Or. Laws 489 ................................. 32

Act of Apr. 8, 1933, No. 64, 1933 Ohio Laws 189........................................ 32

Act of Apr. 10, 1933, ch. 190, § 3, 1933 Minn. Laws 233.............................. 32

**Other Authorities, continued**                                              **Page(s)**

Act of Oct. 25, 1933, ch. 82, §§ 2-3, 1933 Tex. Laws 219 ............................... 32

Act of Nov. 28, 1933, ch. 62, § 1, 1933 Kan. Laws 76.................................... 32

Act of Mar. 2, 1934, No. 731, §§ 2-4, 1934 S.C. Acts 1288........................... 32

Act of Mar. 7, 1934, ch. 96, §§ 2-5, 1934 Va. Acts 138.................................... 32

Alaska Stat. §§ 11.61.200(a)(3), (c), (h)(1)(C) ............................................... 25

Ark. Code Ann. §§ 5-73-204, 5-73-205 .......................................................... 25

Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(iii), 13-3102(A)(3), (F) ................. 25

Colo. Rev. Stat. § 18-12-102 .......................................................................... 24

Conn. Gen. Stat. §§ 53-202(g), (h)................................................................. 25

D.C. Code Ann. § 22-4514 .......................................................................... 24

Del. Code Ann. tit. 11, § 1444(a)(5) ............................................................. 24

Firearm Owners' Protection Act,
   Pub. L. No. 99-308, § 102, 100 Stat. 449 (1986) ....................................... 33

Fla. Stat. § 790.221....................................................................................... 25

Ga. Code Ann. §§ 16-11-122, 16-11-124 ...................................................... 25

Haw. Rev. Stat. § 134-8 ................................................................................. 24

H.R. Rep. No. 83-1337, at A395 (1954) ........................................................ 24

H.R. Rep. No. 99- 495, at 4 (1986)................................................................ 24

720 Ill. Comp. Stat. 5/24-1(a)(7)(i) .............................................................. 24

Ind. Code §§ 35-47-5-8, 35-47-5-10............................................................. 25

**Other Authorities, continued**                                    **Page(s)**

Iowa Code §§ 724.1, 724.3.................................................................. 25

Kan. Stat. Ann. §§ 21-6301(a)(5), (h)........................................... 25

La. Stat. Ann. § 40:1752 ............................................................... 25

Mass. Gen. Laws ch. 140, § 131(o) .............................................. 25

Md. Code Ann., Criminal Law §§ 4-403, 4-404, 4-405.....................25

Me. Stat. tit. 17-A, §§ 1051, 1052 ................................................. 25

Mich. Comp. Laws § 750.224(1), (3)(c) ....................................... 25

Minn. Stat. § 609.67, subd. 2 ........................................................ 25

Mo. Rev. Stat. § 571.020 .............................................................. 25

National Firearms Act, Cal. Penal Code § 32625 ......................... 24

N.C. Gen. Stat. § 14-409 .............................................................. 25

N.D. Cent. Code § 62.1-05-01....................................................... 25

N.J. Stat. Ann. § 2C:39-5(a).......................................................... 25

N.Y. Penal Law § 265.02(2) .......................................................... 25

Neb. Rev. Stat. § 28-1203 ............................................................. 25

Nev. Rev. Stat. § 202.350(1)(b) .................................................... 25

Ohio Rev. Code Ann. §§ 2923.11(K)(1) ), 2923.17(A), (C)(5) ....... 25

Or. Rev. Stat. § 166.272................................................................. 25

18 Pa. Cons. Stat. § 908................................................................. 25

**Other Authorities, continued**                                    **Page(s)**

Penal Code, § 7094, 1895 N.D. Rev. Codes 1259 ........................................... 31

R.I. Gen. Laws § 11-47-8(a) ................................................................... 25

S. Rep. No. 73-1444, at 1-2 (1934) ......................................................... 32

S.C. Code Ann. §§ 16-23-230, 16-23-250, 23-31-330 .................................... 25

S.D. Codified Laws §§ 22-1 2(8), (23), 22-14-6 ............................................ 25

Tenn. Code Ann. § 39-17-1302(a)(3), (d) ................................................... 25

Tex. Penal Code Ann. § 46.05(a)(1)(B) ...................................................... 25

Va. Code Ann. §§ 18.2-290, 18.2-291, 18.2-295 ........................................... 25

W. Va. Code § 61-7-9 ......................................................................... 25

Wash. Rev. Code §§ 9.41.190(1), (4) ......................................................... 25

Wis. Stat. § 941.26(1g)(a) ..................................................................... 25

## STATEMENT OF JURISDICTION

This is a direct appeal from a conviction and sentence in a criminal case. The district court had jurisdiction under 18 U.S.C. 1291 and 18 U.S.C. § 3231, and this Court has jurisdiction under 28 U.S.C. § 3742(a).  The district court entered the judgment against Wilson on July 15, 2024.  (ROA.88.)  Wilson timely filed his notice of appeal that same day.  (ROA.93); Fed. R. App. P. 4(b).

## STATEMENT OF THE ISSUES

1.     After Wilson learned the victim sold his friend a fake pistol, he: (1) pulled out a firearm, which was equipped with a Glock switch; (2) retrieved a 31-round magazine from his vehicle and loaded it into the firearm; (3) walked around a gas station to confront the victim; and (4) killed the victim by firing multiple rounds at him.  Surveillance footage captured the murder, and Wilson admitted to it.  Based on these undisputed facts, did the district court plainly err in finding that Wilson committed second-degree murder, warranting application of USSG § 2A1.2?

2.     Is Wilson's constitutional challenge to Section 922(o) foreclosed by binding precedent?  In any event, is his challenge meritless?

## STATEMENT OF THE CASE

**1.    Wilson kills D.J. in a gas station parking lot and pleads guilty to illegally possessing a machinegun.**

Wilson and his two friends met the victim, D.J., in front of a Valero gas station.  (ROA.196.)  D.J. sold them a firearm, which turned out to be fake.  (ROA.196.)  After the transaction, D.J. left the group to return to his vehicle behind the Valero, and Wilson and his friends quickly discovered the firearm was fake.  (ROA.196.)  Wilson pulled out a handgun from his person, and he returned to his vehicle to retrieve an extended magazine and then loaded it into the firearm.  (ROA.197.)  Wilson and his friends then followed D.J. to the back parking lot and confronted him.  (ROA.197; GX4 at 00:18-00:23.[1])  Wilson pointed his firearm at D.J. and fired multiple rounds.  (ROA.197; GX4 at 00:23-00:45.)  D.J. died, and Wilson fled the scene.  (ROA.197.)  Officers responded to the scene and found D.J. lying in a pool of blood with multiple gunshot wounds.  (ROA.196.)

Wilson was later detained and admitted to investigators that his firearm had a machinegun conversion device (a Glock switch) to make his weapon shoot faster.  (ROA.197-98.)  He also admitted that he shot and killed D.J but claimed he did so in self-defense.  (ROA.197.)  Investigators obtained

---

[1] The government attached surveillance videos—from the Valero and the liquor store across the parking lot—as exhibits to its response to Wilson's PSR objections.  (*See* ROA.241.)

surveillance footage of the incident, which clearly showed Wilson pointing his machinegun pistol at D.J. and firing multiple rounds, even though D.J. was not threatening Wilson. (ROA.196; GX4 at 00:23-00:45; GX5 at 00:30-00:37.)

Wilson was charged by criminal complaint and arrested. (ROA.195.) A federal grand jury later charged him with unlawful machinegun possession, in violation of 18 U.S.C. §§ 922(o) and 924(a)(2). (ROA.25.)[2] Wilson moved to dismiss the indictment, arguing that Section 922(o) violated the Second Amendment, both facially and as applied to him. (ROA.42-48.) The government filed a written response, (ROA.49-55), and the district court denied the motion, (ROA.56-61).

Wilson pled guilty without a written plea agreement, (ROA.195), and he signed a factual resume in support of his guilty plea, (ROA.66-67). The district court accepted his guilty plea as knowing and voluntary and supported by an adequate factual basis. (ROA.146-47, 162.)

## 2.     The district court applies the cross-referenced guideline to second-degree murder and sentences Wilson to 120 months imprisonment.

Wilson's presentence report (PSR) applied a base offense level of 38 pursuant to USSG § 2A1.2—the cross-referenced guideline for second-degree murder. (ROA.199 (citing USSG § 2K2.1(c)(1)(B) (directing courts to apply

---

[2] Wilson was also charged in state court with Murder. (ROA.204.)

the "most analogous" homicide guideline if a death results from a firearms offense).)  The PSR recited the definition of murder as "the unlawful killing of a human being with malice aforethought."  (ROA.199 (citing 18 U.S.C. § 1111(a)).)  The PSR explained that the "details of D.J.'s murder indicate[d] a 'crime of passion' in which the defendant acted against D.J. because of a sudden strong impulse such as anger with minimal planning and within a short period of time."  (ROA.199.)  It then elaborated that, after Wilson learned he had purchased a fake firearm, he "walked back to his vehicle, loaded his firearm containing a Glock switch with an extended magazine, and confronted D.J." before he "shot D.J. multiple times and fled the scene."  (ROA.199.)  It found that "[t]here [wa]s no evidence to support [finding that] D.J. pointed his firearm at the defendant or threatened the defendant's life."  (ROA.199.)

The PSR deducted three points for acceptance of responsibility, reducing Wilson's total offense level to 35.  (ROA.199-200.)  With a criminal-history category of II, Wilson's advisory guideline range was 188 to 235, but it was capped at the statutory-maximum of 120 months.  (ROA.210 (citing USSG § 5G1.1(a)).)

Wilson objected to the murder cross-reference based on self-defense. (ROA.215-17.)  In response, the government argued that Wilson could not meet his burden to prove self-defense, highlighting that "the unimpeachable video evidence clearly shows that Wilson gunned down the victim using a

4

machinegun after learning the victim had sold a fake gun" and that, "at no time did the victim point a firearm at Wilson" or "even have a firearm in his hands." (ROA.233.) The PSR Addendum maintained that Section 2A1.2 should apply, reiterating that there was "no evidence to support [finding that] D.J. pointed his firearm at the defendant." (ROA.231.)

At Wilson's sentencing hearing, the district court overruled the self-defense objection. (ROA.163.) It then adopted the findings of fact in the PSR. (ROA.163-64.) Wilson argued for a downward variance—to 21 to 27 months—asking the court to sentence him "solely on possessing the machine gun" because Wilson would be held accountable for the murder in state court. (ROA.165-66.) The government, in turn, commented that it hoped the court had "watched the video," which clearly showed Wilson shooting the victim without provocation. (ROA.169-70.) And it argued that Wilson should not just be accountable for possessing an illegal firearm, but also for the murder he committed with it. (ROA.170.)

The court sentenced Wilson to 120 months. (ROA.175.) It explained that 120 months was appropriate considering the Section 3553(a) factors because it reflected the seriousness of and provided just punishment for the offense; promoted respect for the law; afforded adequate deterrence to criminal conduct; and protected the public from further crimes by Wilson. (ROA.177-78.) The court noted that Wilson's guideline range would have been much

5

higher without the 10-year cap, but that it "did feel that it was appropriate

under the guidelines and also the *Booker* decision and those factors under 3553

to give [Wilson] the 120-month sentence." (ROA.178.)  In a written statement

of reasons, the court reiterated that it believed 120 months was appropriate

given the Section 3553(a) factors and that, even if the guideline calculations

were wrong, it would have imposed the same sentence.  (ROA.246.)

## SUMMARY OF THE ARGUMENT

The Court should affirm Wilson's conviction and sentence.  The district

court did not err, let alone clearly or obviously so, in finding that the homicide

guideline "most analogous" to Wilson's conduct was second-degree murder

under Section 2A1.2.  Upset that he and his friends had been sold a fake gun,

Wilson retrieved an extended magazine from his car and loaded it into his

machinegun pistol.  Wilson then followed D.J.—who had already separated

from him—to the back of the gas station before shooting him repeatedly.  The

evidence showed, and the district court found, that Wilson did not act in self-

defense.  On this record, the district court correctly determined that these facts

supporting a finding of second-degree murder.

Moreover, even if Wilson could show a clear or obvious error, his

argument still fails at the third and fourth prongs of plain-error review.  He

cannot show that any error affected his substantial rights because the district

court made clear that it believed a 120-month sentence—the statutory

maximum—was warranted given the Section 3553(a) factors, and it made a clear statement that it would have imposed that sentence regardless of the guideline range. Nor does this case warrant this court's intervention at the fourth prong, especially given that Wilson's conduct fits comfortably within what this Court has previously held is sufficient to show second-degree murder.

Finally, the Court can easily dismiss Wilson's challenge to the constitutionality of Section 922(o), because that issue is squarely foreclosed. And even if not foreclosed, Section 922(o)'s longstanding prohibition on machineguns is entirely consistent with the principles underlying our nation's historical tradition of regulating dangerous and unusual weapons.

## ARGUMENT AND AUTHORITIES

**1.    The district court did not plainly err in applying the cross-reference to second-degree murder under Section 2A1.2.**

### Standard of Review

Wilson correctly concedes that plain-error review applies to his argument, which he did not raise below. (Brief at 8.) To succeed on plain-error review, Wilson must show (1) an error; (2) that is clear or obvious, rather than subject to reasonable dispute; and (3) that affected his substantial rights. *Puckett v. United States*, 556 U.S. 129, 135 (2009). If he satisfies these requirements, then, under the fourth prong of the plain-error test, this Court "has the *discretion* to remedy the error—discretion which ought to be exercised

7

only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted). "Meeting all four prongs is difficult, as it should be." *Id.* (internal quotation marks omitted).[3]

## Discussion

### A.     The district court did not err, let alone clearly or obviously so.

The district court correctly applied the cross-reference to second-degree murder. Section 2K2.1(c)(1) directs the court to apply the offense level that would result from the guideline matching the offense committed "in connection with" the gun possession. USSG § 2K2.1(c)(1). "[I]f death resulted," the court should apply "the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide), if the resulting offense level is greater" than it would be under the firearm guideline. USSG § 2K2.1(c)(1)(B). The homicide guidelines reference the federal murder statute, 18 U.S.C. § 1111, which defines murder as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). The statute defines "[a]ny other

---

[3] The Court should reject Wilson's invitation to "relax" its exacting plain-error standard here. (*See* Brief at 8-9.) "As [this Court has] repeatedly noted, where an appellant did not alert the district court to the error of which he . . . complains on appeal," review is for plain error. *United States v. Brooks*, 33 F.4th 734, 739 (5th Cir. 2022) (internal quotation marks omitted). And here, Wilson's objection to the PSR that he acted in self-defense—an affirmative defense that negates the elements of criminal behavior, *see United States v. Santiago*, 96 F.4th 834, 849 (5th Cir. 2024)—did not alert the district court to his argument that his conduct constituted only voluntary manslaughter—an unlawful killing without malice, *see* 18 U.S.C. § 1112(a).

8

murder" that was not premediated or committed as part of other specified crimes as "murder in the second degree." *Id.* Malice aforethought "encompasses three distinct mental states: (1) intent to kill; (2) intent to do serious bodily injury; and (3) extreme recklessness and wanton disregard for human life." *United States v. Hicks*, 389 F.3d 514, 530 (5th Cir. 2004) (internal quotation marks omitted); *see also* Fifth Circuit Pattern Jury Instructions (Criminal) No. 2.52B (2024) ("To kill 'with malice aforethought' means either to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life."). In short, second-degree murder is an unlawful killing with malice aforethought but with the absence of premeditation. *United States v. Harrelson*, 766 F.2d 186, 189 (5th Cir. 1985).

Based on the unrebutted evidence, including surveillance video showing the murder, the district court did not err in applying Section 2A1.2. It is undisputed that, after D.J. sold the fake firearm, he walked around the Valero to the back parking lot. (ROA.196.) After Wilson learned the gun was a fake, he went to his car and retrieved an extended magazine to load into his firearm, which was equipped with a Glock switch. (ROA.197.) He then followed D.J. around to the back of the Valero, engaged in a brief confrontation, and fired multiple rounds directly at him. (ROA.197.)



(GX4 at 00:40.)

The PSR recounted these facts in applying Section 2A1.2, and the district court adopted them.  (ROA.163-64, 199.)

Based on this Court's caselaw, these facts amply supported a finding that Wilson unlawfully killed D.J. with malice aforethought.  In *Hicks*, for example, the defendant argued that the district court erred by applying the second-degree murder guideline instead of involuntary manslaughter where the record showed that he shot and killed a police officer.  389 F.3d at 529.  But this Court affirmed the district court's application of Section 2A1.2, finding that, "[b]y intentionally firing his gun at Officer Lamance's police cruiser, which Hicks likely knew to be occupied . . . Hicks displayed the requisite extreme recklessness and disregard for human life that constitutes malice under federal law sufficient for a finding of second-degree murder."  *Id.* at 530.

This Court has also repeatedly found that shooting *at* someone evidences an intent to kill that person.  For example, in *United States v. White*, this Court recently found that the cross-reference to attempted second-degree murder had

been properly applied where video evidence showed the defendant firing a shot next to the victim's head during a fistfight. No. 23-10194, 2024 WL 4987350, at *5 (5th Cir. Dec. 5, 2024). In *United States v. Bell*, the Court similarly affirmed the cross-reference to attempted first-degree murder where the defendant fired his gun "in [the] general direction" of his girlfriend. No. 23-50168, 2023 WL 7549508, at *1 (5th Cir. Nov. 13, 2023); *see also United States v. Munoz*, 523 F. App'x 278, 278 (5th Cir. 2013) (affirming the guideline for attempted first-degree murder where the defendant admitted that he "fired a shotgun twice while riding in a car in pursuit of another vehicle containing his brother and his brother's wife"). And that inference is particularly strong where someone was shot multiple times. *See United States v. Caston*, 851 F. App'x 557, 564 (6th Cir. 2021) (finding an intent to kill where the defendant fired three times into a victim's car, hitting the victim once); *Winfield v. Dorethy*, 956 F.3d 442, 457 (7th Cir. 2020) ("Multiple shots permit a factfinder to infer an intent to kill."). Given this Court's caselaw and the record in this case, Wilson's conduct—pointing his machinegun and firing multiple shots at D.J.—supports finding that he possessed any of the three mental states encompassed by malice aforethought: intent to kill, intent to cause serious bodily injury, or extreme recklessness and disregard for human life. *See Hicks*, 389 F.3d at 529; *Bell*, 2023 WL 7549508, at *1.

Wilson does not challenge any of these facts or dispute that they support a finding of malice aforethought. Instead, he points to the PSR's characterization of the murder as a "crime of passion" in which Wilson acted on an impulse with little planning, arguing that the district court implicitly found that Wilson committed only voluntary manslaughter. (ROA.199.) Under federal law, if a defendant commits an offense "[u]pon a sudden quarrel or heat of passion," 18 U.S.C. § 1112(a), then "[t]he malice that would otherwise attach is *negated*," and the conduct constitutes voluntary manslaughter, *United States v. Browner*, 889 F.2d 549, 552 (5th Cir. 1989). In other words, an intentional killing is without malice if it "occurs in what the courts have called 'the heat of passion,' a passion of fear or rage in which the defendant loses his normal self-control as a result of circumstances that would provide such a passion in an ordinary person, but which did not justify the use of deadly force." *Id.* And Wilson argues that, because the PSR described the offense as a "crime of passion," the district court necessarily found that Wilson committed voluntary manslaughter. (Brief at 11-12.)

Wilson is wrong. The PSR cited the murder statute (18 U.S.C. § 1111(a)), not the manslaughter statute (18 U.S.C. § 1112(a)), and it correctly defined second-degree murder as an unlawful killing with malice aforethought. Its use of the term "crime of passion" (which is similar to the "heat of passion" language in the manslaughter statute) to describe Wilson's conduct did not

transform its clear finding that Wilson committed murder into a less-culpable finding. Moreover, the base-offense-level analysis correctly (1) recounted the well-supported facts and (2) determined that Section 2A1.2 was the most analogous homicide guideline given those facts. Accordingly, in context, the record is clear that the district court found Wilson committed second-degree murder. And in any event, it was certainly not clear or obvious that the district court found that voluntary manslaughter applied. *See United States v. Jones*, 873 F.3d 482, 499-500 (5th Cir. 2017) (finding no clear or obvious error in the district court's application of Section 2A1.1, even though it did not explain why it chose first-degree—rather than second-degree—murder); *United States v. Blankenship*, No. 22-40619, 2024 WL 640148, at *13 (5th Cir. Feb. 15, 2024) (concluding that the district court did not clearly or obviously err in applying the first-degree murder cross-reference where the record evidence supported it).

The record amply supported the court's finding that Wilson killed D.J. with malice aforethought, and this Court has affirmed similar findings on similar records. In *Frascarelli v. United States Parole Commission*, for example, this Court determined that the defendant's conduct was most analogous to second-degree murder where, following an argument with his girlfriend, he went down the stairs from the second floor, took a hammer from a toolbox, went back up the stairs, and assaulted her with it. 857 F.3d 701, 703 (5th Cir. 2017). This Court explained that there was "scant evidence that [the victim]

said or did anything during their argument over money to constitute adequate provocation that would provoke a reasonable person to kill" and that, even if the defendant was adequately provoked, the facts showed that the heat of passion had time to "cool." *Id.* at 707-08; *see also, e.g.*, *Lara v. United States Parole Comm'n*, 990 F.2d 839, 841 (5th Cir. 1993); *United States v. Walter*, 775 F. App'x 25, 27-28 (2d Cir. 2019) (finding that a "heat of passion" defense did not apply where the defendant separated from the victim after a confrontation, retrieved his gun, and returned to the scene).

Likewise, in *United States v. Collins*, the defendant appealed his murder conviction, arguing that the district court should have instructed the jury on the lesser included offense of voluntary manslaughter. 690 F.2d 431, 437 (5th Cir. 1982). He argued that he had killed his victim, a supervisor, "out of a sense of rage over the loss of his livelihood" because, among other things, she had caused him to receive an unsatisfactory rating. *Id.* But this Court found that, even if true, his allegations did not describe the type of provocation that would cause an "ordinary, reasonable person to act rashly." *Id.*

The same is true here. Wilson's anger about being sold a fake firearm is insufficient to show that a reasonable person would have been *provoked to kill*, and Wilson does not provide any authority supporting that contention. (Brief at 11-12.) And even if Wilson was adequately provoked, he had time to cool off. Wilson (1) went back to his car to retrieve an extended magazine for his

14

firearm before (2) walking around the building to the back parking lot to find and confront D.J., who had already separated from Wilson and his friends. (ROA.196-97; GX4.)  The PSR recounted these facts and determined that they supported the second-degree murder guideline, and the district court adopted those findings.  There was no error, let alone a clear or obvious one, in the district court's determination that Section 2A1.2 applied.

Finally, Wilson's only argument that the error was clear or obvious is that the PSR's terminology essentially "matches the definition of voluntary manslaughter."  (Brief at 13.)  But he does not point to any binding authority holding that a district court errs in applying a homicide guideline where (1) the overwhelming facts support its application but (2) the PSR uses an ambiguous description for the conduct while applying the proper guideline.  He therefore cannot satisfy the second prong of plain-error review.  *See United States v. McGavitt*, 28 F.4th 571, 577 (5th Cir. 2022) (explaining that "a lack of binding authority is often dispositive in the plain-error context"); *United States v. Bishop*, 603 F.3d 279, 281 (5th Cir. 2010) ("An error is not plain unless the error is clear under current law.").

In short, given the overwhelming evidence demonstrating that Wilson unlawfully killed D.J. with malice aforethought, he cannot show that the district court erred in applying Section 2A1.2.  And even though the PSR used the ambiguous—and legally meaningless—phrase "crime of passion" to refer

to Wilson's conduct, the facts showed that second-degree murder—not
voluntary manslaughter—was the correct guideline, which is what the district
court found.  There was no error, and certainly not a clear or obvious one.

### B.     Wilson cannot meet his burden to prove the third and fourth prongs of plain-error review.

To satisfy the third prong of plain-error review, Wilson must show that
the error affected his substantial rights—*i.e.*, he must demonstrate a reasonable
probability that he would have received a lesser sentence but for the error.
*United States v. Nino-Carreon*, 910 F.3d 194, 197 (5th Cir. 2018).  "When a
defendant is sentenced under an incorrect Guidelines range—whether or not
the defendant's ultimate sentence falls within the correct range—the error itself
can, and most often will, be sufficient to show a reasonable probability of a
difference outcome absent the error."  *Molina-Martinez v. United States*, 578 U.S.
189, 198 (2016).  In *Molina-Martinez*, for example, the district court said
nothing specific about why it chose the sentence besides merely adopting the
recommended range, and thus "the Guidelines served as the starting point for
the sentencing and were the focal point for the proceedings that followed."
*Molina-Martinez*, 578 U.S. at 202.  But the Supreme Court recognized that
"[t]here may be instances when, despite application of an erroneous
Guidelines range, a reasonable probability of prejudice does not exist."  *Id.* at
200.  One such instance "is when the district court provides a detailed

explanation of the reasons the selected sentence is appropriate that makes it clear that the judge based the sentence on factors independent of the Guidelines." *United States v. Parra*, 111 F.4th 651, 661 (5th Cir. 2024) (citations and internal quotations omitted).

Wilson cannot carry his burden to show that any error affected his substantial rights. The court explicitly cited the Section 3553(a) factors in finding that 120 months was the appropriate sentence given Wilson's conduct. (ROA.177-78.) The court noted multiple times that the statutory factors compelled a 120-month sentence, which was the statutory maximum. (ROA.178.) Then, the court reiterated in a written statement of reasons that it believed 120 months was appropriate given the seriousness of Wilson's offense, the need to provide just punishment, the need to promote respect for the law, deterrence, and to protect the public. (ROA.246.) And it clearly stated: "Even if the guideline calculations are not correct, this is the sentence the Court would otherwise impose under 18 U.S.C. § 3553." (ROA.246.)

Given the district court's reasoning for the sentence and its clear statement that it would have imposed the same sentence even if the guideline range was incorrect, "a reasonable probability of prejudice does not exist." *Molina-Martinez*, 578 U.S. at 200; *United States v. Forbito*, No. 22-11026, 2023 WL 8274528, at *4-5 (5th Cir. Nov. 30, 2023) (unpublished). Because "[t]hat is all that is needed to prevent a defendant from carrying his plain-error burden

17

in this instance," this Court can affirm at the third prong. *Forbito*, 2023 WL 8274528, at *5 (citing *United States v. Randall*, 924 F.3d 790, 796 (5th Cir. 2019)). Additionally, the fact that the district court imposed the statutory-maximum sentence demonstrates that it had a particular sentence in mind and would have imposed it regardless of the guideline range. *See United States v. Williams*, 841 F. App'x 686, 687 (5th Cir. 2021) ("The district court's comments at sentencing show that its selection of the sentence was not based on an erroneous . . . guidelines range and instead was driven by the belief that the statutory maximum was the appropriate sentence.").

Finally, this case does not warrant this Court's discretionary intervention under the fourth prong. Simply put, this is not a case in which the Court should feel compelled to exercise its discretion to remedy any error. As discussed above, the second-degree murder guideline was appropriately applied. The undisputed facts showed that Wilson gunned down D.J. in a parking lot with a machinegun after learning he had been sold a fake firearm, even though D.J. was not threatening him. This Court's precedent amply supports applying the second-degree murder guideline on these facts. The Court should affirm.

**2.    Wilson's constitutional challenge to Section 922(o) is foreclosed by binding precedent and, in any event, is meritless.**

<u>Standard of Review</u>

Wilson preserved his constitutional challenge to 18 U.S.C. § 922(o), so review is de novo.  *United States v. Diaz*, 116 F.4th 458, 462 (5th Cir. 2024).

<u>Discussion</u>

**A.    This Court's precedent holds that machineguns are not arms protected under the Second Amendment, foreclosing Wilson's challenge.**

The Court should summarily affirm Wilson's conviction.  Section 922(o) makes it "unlawful for any person to transfer or possess a machinegun," subject to certain exceptions not relevant here.  18 U.S.C. § 922(o).  A machinegun is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b); *see also Hollis v. Lynch*, 827 F.3d 436, 440 (5th Cir. 2016) (explaining that Section 922(o)'s definition of "machinegun" is the same one adopted in Section 5845(b)).

This Court rejected the argument that machinegun possession deserves Second Amendment protection in *Hollis*.  There, the Court carefully surveyed the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and "glean[ed]" two principles: (1) the Second Amendment protects

weapons that are "in common use at the time"; and (2) "if a weapon is dangerous and unusual, it is not in common use and not protected by the Second Amendment." *Hollis*, 827 F.3d at 445-46. The Court then examined machineguns specifically, concluding that "[m]achineguns are dangerous and unusual and therefore not in common use." *Id.* at 451. As a result, machineguns "do not receive Second Amendment protection," meaning Section 922(o) does not violate the Second Amendment. *Id.*; *see also Bezet v. United States*, 714 F. App'x 336, 340-41 (5th Cir. 2017) (applying *Hollis* to reject a Second Amendment challenge to Section 922(o)).

Wilson suggests that the Court should ignore *Hollis* in light of *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). But this Circuit follows its rule of orderliness, under which "only an intervening change in the law (such as by a Supreme Court case) permits a subsequent panel to decline to follow a prior Fifth Circuit precedent." *United States v. Alcantar*, 733 F.3d 143, 145-46 (5th Cir. 2013). An intervening change in the law "must be *unequivocal*." (*Id.* (emphasis added).)

Nothing in *Bruen* unequivocally overruled *Hollis*. *Bruen* addressed a New York law limiting the ability of law-abiding citizens to carry *handguns* outside the home. 597 U.S. at 13-14. But *Bruen* said nothing about whether machineguns deserve Second Amendment protection. If anything, *Bruen* reaffirmed *Hollis* by explaining that there is a "fairly supported" "historical

20

tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"
*Bruen*, 597 U.S. at 21.  Likewise, Justice Kavanaugh's concurring opinion,
joined by the Chief Justice, reiterated an "important limitation on the right to
keep and carry arms"—*i.e.*, the "historical tradition of prohibiting the carrying
of dangerous and unusual weapons."  *Id.* at 81 (citing *Heller*, 554 U.S. at
626–27 & n.26; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality
opinion)).  Because nothing in *Bruen* unequivocally overruled *Hollis*, this Court
is "not at liberty to overrule [its] settled precedent" in *Hollis*.  *Alcantar*, 733 F.3d
at 146.

Wilson also argues this Court should revisit *Hollis* in light of more-recent
statistics purporting to show that machineguns are more prevalent now than
they were nine years ago, when *Hollis* was decided.  (Brief at 24-25.)  Such
statistics do not constitute an intervening decision from the Supreme Court, or
the en banc court, that would allow a panel to overrule *Hollis*.  *See Alcantar*, 733
F.3d at 145.  Indeed, Wilson cites no case holding that this Court can disregard
its rule of orderliness when the appellant presents updated statistics—and for
good reason.  "[O]*nly an intervening change in the law*" permits "a subsequent
panel to decline to follow a prior Fifth Circuit precedent."  *Id.* (emphasis
added).  In sum, Wilson's Second Amendment challenge to Section 922(o) is
squarely foreclosed by *Hollis*.  *See United States v. Ovalle*, No. 24-50023, 2024
WL 4678881, at *1 (5th Cir. Nov. 5, 2024) (summarily affirming and accepting

21

appellant's concession that *Hollis* forecloses constitutional challenge to Section 922(o)).

In sum, Wilson's Second Amendment challenge to Section 922(o) is foreclosed and should be rejected.

**B.    Even if not foreclosed, Wilson's claim fails on the merits.**

**i.    The Second Amendment does not protect machineguns**.

Even if the Court finds that *Hollis* does not squarely foreclose Wilson's claim, it should nonetheless affirm because *Hollis*'s holding—that machineguns are not protected by the Second Amendment—is correct.

The Second Amendment states that the "right of the people to keep and bear Arms, shall not be infringed."   U.S. Const. amend. II.  The Supreme Court has recognized an "important limitation on the right to keep and carry arms"—"the sorts of weapons protected [a]re those 'in common use at the time.'"  *Heller*, 554 U.S. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).   Put another way, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625.  Courts cannot look at the Amendment's text in isolation but must instead consider the text "according to the understandings of those who ratified it," *Bruen*, 597 U.S. at 28.   And, as *Heller* explained, the right to bear arms was not understood in 1791 as "a right to keep and carry

any weapon whatsoever," *Heller*, 554 U.S. at 626, but only as a right to possess firearms "'in common use at the time,'" *id.* at 627.

Machineguns are not protected by the Second Amendment because they are not "typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, but are instead "adapted for unlawful uses," *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 116-17 (10th Cir. 2024). Since *Heller*, multiple courts of appeals have upheld § 922(o) on that basis. *See United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008); *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136, 142 (3rd Cir. 2016); *Hollis*, 827 F.3d at 451; *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (observing that "[a] machine gun is 'unusual'" and that "[o]utside of a few government-related uses, machine guns largely exist on the black market"); *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009) (challenge to Section 922(o) was "foreclosed" by *Heller*'s statement that "'the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes'"); *United States v. Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012) (unpublished) (same).

The reasoning of those courts is supported by relevant evidence. Machineguns are extraordinarily lethal. The Supreme Court has recognized "[t]he immense danger posed by machineguns." *United States v. O'Brien*, 560

U.S. 218, 230 (2010).  As the Ninth Circuit has explained, "[a] modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds." *Henry*, 688 F.3d at 640. Thus, "[s]hort of bombs, missiles, and biochemical agents," that court could "conceive of few weapons that are more dangerous than machine guns." *Id.*

Moreover, machineguns are "specially adapted to unlawful uses." *Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from denial of certiorari); *see Polis*, 121 F.4th at 116-17 (observing that "the Second Amendment does not extend to weapons" that are "adapted for unlawful uses").  As Congress has observed, machineguns are "used readily and efficiently by criminals or gangsters," H.R. Rep. No. 83-1337, at A395 (1954), and are "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime," H.R. Rep. No. 99-495, at 4 (1986).

The legislative landscape reflects this judgment and indicates that machineguns are not in common use for lawful purposes.  Twelve states and the District of Columbia prohibit the possession of machineguns by private persons, regardless of whether they are properly registered under the National Firearms Act.[4]  Another 25 states regulate or ban private machinegun

---

[4] Cal. Penal Code § 32625; Colo. Rev. Stat. § 18-12-102; Del. Code Ann. tit. 11, § 1444(a)(5); D.C. Code Ann. § 22-4514; Haw. Rev. Stat. § 134-8; 720 Ill. Comp. Stat.

possession while providing an exception or affirmative defense for machineguns possessed in compliance with federal law.[5]   And two states, without mentioning federal law, require registration of machineguns and make their public carry presumptively unlawful.[6]   Thus, unlike with commonly owned firearms such as handguns, there is a nationwide legislative consensus of prohibiting or severely restricting the possession of machineguns.

Statistical evidence also shows that machineguns are not typically possessed by law-abiding citizens for lawful purposes.  As of 2016, there were "175,977 pre-1986 civilian-owned machineguns in existence."   *Hollis*, 827 F.3d at 449 (citing ATF statistics).  That is a tiny fraction of the 300 million

---

5/24-1(a)(7)(i); Iowa Code §§ 724.1, 724.3; Mass. Gen. Laws ch. 140, § 131(o); Minn. Stat. § 609.67, subd. 2; N.J. Stat. Ann. § 2C:39-5(a); N.Y. Penal Law § 265.02(2); R.I. Gen. Laws § 11-47-8(a); Wis. Stat. § 941.26(1g)(a).

[5] Alaska Stat. § 11.61.200(a)(3), (c), (h)(1)(C); Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(iii), 13-3102(A)(3), (F); Ark. Code Ann. §§ 5-73-204, 5-73-205; Conn. Gen. Stat. § 53-202(g), (h); Fla. Stat. § 790.221; Ga. Code Ann. §§ 16-11-122, 16-11-124; Ind. Code §§ 35-47-5-8, 35-47-5-10; Kan. Stat. Ann. § 21-6301(a)(5), (h); La. Stat. Ann. § 40:1752; Me. Stat. tit. 17-A, §§ 1051, 1052; Mich. Comp. Laws § 750.224(1), (3)(c); Mo. Rev. Stat. § 571.020; Neb. Rev. Stat. § 28-1203; Nev. Rev. Stat. § 202.350(1)(b); N.C. Gen. Stat. § 14-409; N.D. Cent. Code § 62.1-05-01; Ohio Rev. Code Ann. §§ 2923.11(K)(1), 2923.17(A), (C)(5); Or. Rev. Stat. § 166.272; 18 Pa. Cons. Stat. § 908; S.C. Code Ann. §§ 16-23-230, 16-23-250, 23-31-330; S.D. Codified Laws §§ 22-1 2(8), (23), 22-14-6; Tenn. Code Ann. § 39-17-1302(a)(3), (d); Tex. Penal Code Ann. § 46.05(a)(1)(B); Wash. Rev. Code § 9.41.190(1), (4); W. Va. Code § 61-7-9.

[6] Md. Code Ann., Criminal Law §§ 4-403, 4-404, 4-405; Va. Code Ann. §§ 18.2-290, 18.2-291, 18.2-295.

to 500 million privately owned firearms in the United States.[7]  And it pales in comparison even to the number of firearms manufactured in and imported into the United States every year, which has exceeded 20 million in recent years.[8]  Moreover, those approximately 176,000 civilian-owned machineguns are not spread over 176,000 civilians, because many are amassed by collectors who own multiple machineguns.[9]  But even assuming (wrongly) that those machineguns were spread among 176,000 civilians, only one in 1,908 Americans—roughly 0.05% of the population—would legally own a machinegun,[10] compared to the roughly one in three Americans who owns a firearm.[11]

---

[7] *See* The Trace, *How Many Guns are Circulating in the U.S.?*, https://www.thetrace.org/2023/03/guns-america-data-atf-total/(estimate of 494 million); Small Arms Survey, Estimating Global Civilian-Held Firearms Numbers, at 4 (June 2018), https://www.smallarmssurvey.org/sites/default/ files/resources/SAS-BP-Civilian-Firearms-Numbers.pdf (estimate of 393 million); John Berrigan, et al., *The Number and Type of Private Firearms in the United States*, Annals of the American Academy of Political and Social Science, Vol. 704, Issue 1, at 82 (Nov. 2022) (estimate of 326 million in 2019).

[8] *See* The Trace, *How Many Guns are Circulating in the U.S.?*, https://www.thetrace.org/2023/03/guns-america-data-atf-total/.

[9] *See* Boise State Public Radio, *Automatic weapons are legal, but it takes a lot to get one of the 630,000 in the U.S.* (Dec. 21, 2018), https://www.boisestatepublicradio.org/news/2018-12-21/automatic- weapons-are-legal-but-it-takes-a-lot-to-get-one-of-the-630-000-in-the-u-s (interviewing a collector with more than 20 machineguns).

[10] *See* U.S. Census Bureau, Happy New Year 2024!, https://www.census.gov/library/stories/2023/12/happy-new-year-2024.html (estimating a population of 335,893,238).

[11] *See* Pew Research Center, Key facts about Americans and guns, https://www.pewresearch.org/short-reads/2024/07/24/key-facts-about- americans-and-guns/.

Given the fixed supply of pre-1986 machineguns, the cost of a privately registered machinegun is extremely high. "[T]oday, a transferable M16 costs nearly $30,000 while 'entry-level' machine guns cost in the ballpark of $10,000." Oliver Krawczyk, *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*, 127 Dickinson L. Rev. 273, 285 (2022). The current wait time for such a transfer (accomplished using ATF Form 4) is 158 days for paper forms and 20 days for electronic forms. ATF, Current Processing Times, https://www.atf.gov/resource- center/current-processing-times (as of February 1, 2025). The limited number of pre-1986 machineguns in civilian hands, their high cost, and the difficulty of acquiring them all indicate that they are not "in common use" or "typically possessed by law-abiding citizens." *Heller*, 554 U.S. at 624-25, 627. This Court should follow *Heller* and other circuits in holding that machineguns are not "typically possessed by law-abiding citizens for lawful purposes," but are instead "dangerous and unusual." *Id.* at 625, 627 (quotation omitted).

> ### ii. Section 922(o) is consistent with the historical principle that the government may ban dangerous and unusual weapons.

Because it prohibits possession only of firearms that are not typically possessed by law-abiding citizens for lawful purposes, Section 922(o) is "consistent with the principles that underpin [the Nation's] regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). As *Heller*

explained, the "common use" limitation "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627 (citing 12 historical sources). Thus, *Heller* has already authoritatively established this principle.

In any event, an array of historical laws confirms the principle that *Heller* recognized. In England, the 1328 Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armor." 2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen*, 597 U.S. at 41-45. This statute was understood to provide that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land." 4 William Blackstone, *Commentaries on the Laws of England* 148-49 (10th ed. 1787); *see Rahimi*, 602 U.S. at 697-98. In this way, the statute was consistent with the common law offense of "affray," which included cases "where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716).

The American colonies likewise "prohibited the carrying of 'dangerous and unusual weapons.'" *Bruen*, 597 U.S. at 47; *see Heller*, 554 U.S. at 627. Early American justice-of-the-peace manuals empowered justices to confiscate

the arms of a person who "arm[ed] himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people."[12] Colonial Massachusetts (1692) and New Hampshire (1701) codified this authority, providing that justices of the peace could arrest "all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride, or go armed offensively . . . by night or by day, in fear or affray of their majesties' liege people."[13]   In the late-18th century, the Commonwealth of Virginia (1786) similarly provided that no person shall "ride armed by night nor by day, . . . in terror of the Country,"[14] and the Commonwealth of Massachusetts (1795) later again directed justices of the peace to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."[15]   Confirming that

---

[12] Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer*, 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22- 24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

[13] *See* Act of Nov. 1, 1692, ch. 18, § 6, *in* 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, *in* 1 *Laws of New Hampshire 679* (Albert Stillman Batchellor ed., 1904).

[14] Act of Nov. 27, 1786, ch. 21, *in A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).

[15] Act of Jan. 29, 1795, ch. 2, 1795 Mass. Acts 436.

these early laws targeted not just "terror" but also dangerousness, the province of East New Jersey (1686) prohibited the *concealed* carry of "unusual and unlawful weapons."[16]   Although these statutes contemplated that an affray required "something more" than merely carrying any firearm in public, *Bruen*, 597 U.S. at 50, they contemplated that it would naturally constitute affray to carry dangerous and unusual weapons, *see id.* at 46-47.

Throughout the 1800s, states adopted restrictions on a wide variety of dangerous and unusual weapons.  For example, many states banned the sale, carry, or concealed carry of dangerous knives such as Bowie knives, Arkansas toothpicks, dirks, and daggers.[17]   Many states also banned the possession, sale, carry, or concealed carry of blunt weapons such as slung shots, brass

---

[16] An Act Against Wearing Swords, &c., ch. 9, *in* Aaron Leaming & Jacob Spicer, *Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289-90 (2d ed. 1881).

[17] *See, e.g.*, Act of Dec. 25, 1837, § 1, 1837 Ga. Laws 90; Act of Jan. 27, 1838, ch. 137, § 1, 1838 Tenn. Pub. Acts 200; Act of Feb. 2, 1838, ch. 101, § 1, 1838 Va. Acts 76; Act of Jan. 6, 1841, Penal Code, ch. 7, § 4, 1840 Ala. Laws 148-49; Act of Mar. 14, 1855, No. 120, § 115, 1855 La. Acts 148; Act of Feb. 23, 1859, ch. 78, § 1, 1859 Ind. Laws 129; Act of Mar. 18, 1859, § 1, 1859 Ohio Laws 56-57; Act of Mar. 1, 1864, ch. 128, § 1, 1864 Cal. Stat. 115; Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws 25; Act of Feb. 15, 1872, ch. 7, § 1, 1872 Wis. Laws 17; Act of Mar. 4, 1873, ch. 58, pt. 1, ch. 4, § 25, 1873 Neb. Laws 724; Act of Dec. 27, 1873, ch. 226, § 168, 1872 W. Va. Acts 709; Act of Feb. 16, 1875, § 1, 1875 Ark. Acts 156-57; Act of Feb. 28, 1878, ch. 46, § 1, 1878 Miss. Laws 175; Act of Mar. 5, 1879, ch. 127, § 1, 1879 N.C. Laws 231; Act of May 24, 1879, § 1, 1879 Ill. Laws 114-15; Act of Dec. 24, 1880, No. 362, § 1, 1880 S.C. Acts 447-48; Act of Feb. 1, 1881, § 1, 1881 Colo. Laws 74; Act of Apr. 1, 1881, ch. 96, § 1, 1881 Ark. Acts 191-92; Act of April 16, 1881, § 4, 1881 Ill. Laws 74; Act of Mar. 14, 1882, ch. 219, § 1, 1881 Va. Acts 233; Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Feb. 18, 1885, § 1, 1885 Or. Laws 33; Act of Apr. 7, 1886, ch. 375, § 1, 1886 Md. Laws 602; Act of May 31, 1887, No. 129, § 1, 1887 Mich. Pub. Acts 144; Act of May 3, 1893, ch. 1180, § 1, 1893 R.I. Pub. Laws 231-32; Act of June 2, 1893, ch. 4124, § 1, 1893 Fla. Laws 51.

knuckles, and billy clubs.[18]    Consistent with a colonial New Jersey (1771) statute that made it a crime to "set any loaded Gun . . . intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance,"[19] various states in the 19th and 20th centuries criminalized the setting of "trap guns."[20]

In the mid-1920s, light, portable machineguns such as the Thompson submachine and the Browning Automatic Rifle became publicly available in the United States and began to be used by gangsters and criminals. *See* Robert J. Spitzer, *Understanding Gun Law History After Bruen: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 60-63 (2023).    Between 1925 and 1934, at least half the states responded to this societal problem by enacting

---

[18] *See, e.g.*, Act of Apr. 7, 1849, ch. 278, § 2, 1849 N.Y. Laws 404; Act of Nov. 12, 1849, No. 36, § 2, 1849 Vt. Acts 26; Act of Aug. 6, 1868, No. 13, ch. 1637, ch. 7, § 11, 1868 Fla. Laws 95; Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws 25; Act of Feb. 16, 1875, § 1, 1875 Ark. Acts 156-57; Act of Apr. 16, 1881, § 1, 1881 Ill. Laws 73; Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of May 3, 1893, ch. 1180, § 1, 1893 R.I. Pub. Laws 231-32.

[19] Act of December 21, 1771, ch. 540, § 10, 1771 N.J. Laws 346.

[20] *See, e.g.*, Act of Mar. 6, 1852, § 103, 1851 Utah Laws 137; Act of Feb. 25, 1869, ch. 33, § 1, 1869 Wis. Laws 35; Act of Feb. 27, 1869, ch. 39, § 1, 1869 Minn. Laws 50-51; Act of Apr. 22, 1875, No. 97, § 1, 1875 Mich. Pub. Acts 136; Act of Nov. 25, 1884, No. 76, § 1, 1884 Vt. Acts. 74-75; Penal Code, § 7094, 1895 N.D. Rev. Codes 1259; Act of Mar. 8, 1909, ch. 240, § 22, 1909 S.D. Laws 450; Act of Mar. 22, 1909, ch. 249, § 266, 1909 Wash. Laws 973; Act of Feb. 14, 1913, No. 201, § 16, 1912 Vt. Acts 260-61; Act of Apr. 1, 1913, ch. 186, § 1, 1913 N.J. Laws 339; Act of Apr. 21, 1915, ch. 133, § 17, 1915 N.H. Laws 180-81; Act of July 7, 1921, ch. 530, § 1, 1921 Wis. Laws 870; Act of Feb. 11, 1925, ch. 31, § 1, 1925 Or. Laws 42; Act of Feb. 25, 1931, No. 58, § 1, 1931 S.C. Acts 78; Act of June 16, 1931, No. 327, § 236, 1931 Mich. Pub. Acts 671; *see* Act of May 25, 1911, ch. 195, § 1, 1911 N.Y. Laws 442.

anti- machinegun laws, including comprehensive bans.[21]   Congress, too, responded to the "law violator" and "his most dangerous weapon," S. Rep. No. 73-1444, at 1-2 (1934), by enacting the National Firearms Act 1934, which imposed a $200 tax on machineguns and required that they be registered with the federal government, *see* 26 U.S.C. §§ 5801-5802, 5811-5812, 5821-5822, 5841-5842, 5845(a)-(b).   The $200 tax was prohibitively expensive to most Americans, as it was "equivalent to nearly $4,500 today." W. Kip Viscusi & Kyle J. Blasinsky, *Leveraging Public Support for Gun Laws to Reduce Mass Shootings*, 2024 U. Ill. L. Rev. 707, 755 (2024).   The taxing and registration system made it more difficult for "the criminal class" to obtain the weapons and made it easier to "convict [criminals] when they have the weapons."   *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on*

---

[21] *See* Act of June 5, 1925, ch. 3, 1925 W. Va. Acts 24-32; Act of May 16, 1927, ch. 552, § 1, 1927 Cal. Stat. 938; Act of Mar. 19, 1927, ch. 95, § 2, 1927 N.J. Laws 181; Act of Mar. 9, 1927, ch. 156, § 1, 1927 Ind. Acts 469; Act of Apr. 19, 1927, ch. 234, § 1, 1927 Iowa Acts 201; Act of Apr. 22, 1927, ch. 1052, § 4, 1927 R.I. Pub. Laws 257; Act of Apr. 27, 1927, ch. 326, § 1, 1927 Mass. Acts 413-14; Act of June 2, 1927, No. 372, § 3, 1927 Mich. Pub. Acts 888-89; Act of May 28, 1929, ch. 132, § 1, 1929 Wis. Laws 157; Act of Apr. 25, 1929, No. 329, § 2, 1929 Pa. Laws 777; Act of Apr. 29, 1929, ch. 190, § 1, 1929 Neb. Laws 674; Act of June 1, 1929, H.B. 498, § 1, 1929 Mo. Laws 170; Act of Feb. 25, 1931, ch. 249, § 1, 1931 Del. Laws 813; Act of Mar. 9, 1931, ch. 178, § 2, 1931 N.D. Laws 306; Act of Apr. 15, 1931, ch. 435, § 1, 1931 N.Y. Laws 1033; Act of July 2, 1931, § 2, 1931 Ill. Laws 452-53; Act of July 7, 1932, No. 80, § 2, 1932 La. Acts 337; Act of Feb. 28, 1933, ch. 206, §§ 1-5, 1933 S.D. Laws 245-46; Act of Mar. 6, 1933, ch. 64, § 1, 1933 Wash. Laws 335; Act of Mar. 10, 1933, ch. 315, § 3, 1933 Or. Laws 489; Act of Apr. 8, 1933, No. 64, 1933 Ohio Laws 189; Act of Apr. 10, 1933, ch. 190, § 3, 1933 Minn. Laws 233; Act of Oct. 25, 1933, ch. 82, §§ 2-3, 1933 Tex. Laws 219; Act of Nov. 28, 1933, ch. 62, § 1, 1933 Kan. Laws 76; Act of Mar. 2, 1934, No. 731, §§ 2-4, 1934 S.C. Acts 1288; Act of Mar. 7, 1934, ch. 96, §§ 2-5, 1934 Va. Acts 138.

*Ways & Means*, 73d Cong. at 6, 12, 22 (statement of Attorney General Homer Cummings).

In 1986, Congress adopted § 922(o) as part of the Firearm Owners' Protection Act, Pub. L. No. 99-308, § 102, 100 Stat. 449, 453 (1986). That provision "effectively freezes the number of legal machine guns in private hands at its 1986 level," *United States v. Kenney*, 91 F.3d 884, 885 (7th Cir. 1996), by making it illegal for "any person to transfer or possess a machinegun" unless the transfer or possession is (a) under the authority of a government entity or (b) involves a "machinegun that was lawfully possessed" before 1986, 18 U.S.C. § 922(o)(2)(A), (B). The transfer of a pre-1986 machinegun continues to be subject to a $200 tax. 26 U.S.C. § 5811(a).

Section 922(o) is consistent with the principles underlying this longstanding tradition of firearm regulation. English and American jurisdictions restricted the carrying of dangerous and unusual weapons even before the founding era. *See Rahimi*, 602 U.S. at 691. States restricted a variety of such weapons throughout the 1800s, apparently without "disputes regarding the lawfulness of such prohibitions." *Bruen*, 597 U.S. at 30. And many states—followed quickly by the federal government—began regulating machineguns within a few years of their entry into civilian use. Section 922(o) is therefore part of a tradition of weapons regulation that goes back to the founding. And this longstanding tradition shows that the government

may ban firearms not typically possessed by law-abiding citizens for lawful

purposes, such as dangerous and unusual weapons.   *See Rahimi*, 602 U.S. at

724 (Kavanaugh, J., concurring) ("Post-ratification interpretations and

applications by government actors—at least when reasonably consistent and

longstanding—can be probative of the meaning of vague constitutional

text.").

    Post-ratification history is particularly relevant given that

machineguns are largely a 20th-century innovation.   As *Bruen* recognized,

"unprecedented societal concerns or dramatic technological changes may

require a more nuanced approach" to the analogical inquiry.   *Bruen*, 597

U.S. at 27.   The invention of machineguns—particularly lightweight and

publicly available machineguns—represented a dramatic technological

advancement.   Guns in the 18th century generally fired only one shot, often

misfired, and took a long time to load.   See Randolph Roth, *Why Guns Are

and Are Not the Problem, in* Jennifer Tucker et al. eds., *A Right to Bear Arms?:

The Contested Role of History in Contemporary Debates on the Second Amendment*

117 (2019).

The 1920s, however, saw the introduction of firearms like the

Browning Automatic Rifle and Thompson submachine gun, which were

lightweight, maneuverable, and could fire automatically at rates exceeding

600 rounds per minute from magazines containing at least 20 (and up to 100)

rounds.   Spitzer, *supra*, 51 Fordham Urb. L.J. at 61-63.   The availability of

such machineguns in the civilian market brought with it new societal

concerns, including the use of such weapons by gangsters and other

criminals.   *Id.* at 62-63.   The fact that many states and the federal

government quickly responded to these societal and technological

developments with laws regulating machineguns—and the absence of

"disputes regarding the lawfulness of such prohibitions," *Bruen*, 597 U.S. at

30—indicates that § 922(o) is consistent with the longstanding tradition of

regulating dangerous and unusual weapons.  As Justice Kavanaugh

explained in *Rahimi*, state and federal laws and practices "over time" have

"often reflected and reinforced common understandings of the Constitution's

authorizations and limitations." *Rahimi*, 602 U.S. at 724 (Kavanaugh, J.,

concurring).

    In sum, Wilson's constitutional challenge fails, and the Court should

affirm.[22]

---

[22] Although Wilson raised both as-applied and facial challenges below, on appeal, he makes
only a facial challenge to Section 922(o) and does not argue that the statute is
unconstitutional as applied to his activity.  In any event, this Court's recent decisions
addressing Section 922(g)(1) make clear that a prohibition on machinegun possession is
constitutional as applied to Wilson, who is clearly dangerous.  *See United States v. Bullock*,
No. 23-60408, at *1-2 (5th Cir. Nov. 25, 2024) (confirming that legislatures have the power
to prohibit dangerous people from possessing guns).  And Wilson makes no effort to argue
that he is not dangerous, which is unsurprising given that he used his illegal machinegun
pistol to murder someone.

## CONCLUSION

This Court should affirm the judgment.

Respectfully submitted,

Chad E. Meacham
Acting United States Attorney

*/s/ Lindsey D. Pryor*
Lindsey D. Pryor
Assistant United States Attorney
Texas State Bar No. 24099182
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8822
lindsey.pryor@usdoj.gov

Attorneys for Appellee

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,067 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Calisto MT font.

*/s/ Lindsey D. Pryor*
Lindsey D. Pryor