# United States Court of Appeals for the Fifth Circuit

---

No. 24-10633

---

United States Court of Appeals
Fifth Circuit

**FILED**

January 12, 2026

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

JAMAION WILSON,

*Defendant—Appellant.*

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:24-CR-27-1

---

Before WIENER, WILLETT, and HO, *Circuit Judges.*

DON R. WILLETT, *Circuit Judge*:

After being duped into buying a fake firearm, Jamaion Wilson retaliated—shooting the seller dead with a handgun modified to fire like a machinegun. Wilson later confessed and pleaded guilty to unlawful possession of a machinegun under 18 U.S.C. § 922(o). At sentencing, the district court applied the Sentencing Guidelines cross-reference to second-degree murder, concluding that offense most closely reflected Wilson's conduct.

No. 24-10633

On appeal, Wilson raises two challenges: (1) that his conviction violates the Second Amendment, and (2) that the district court misapplied the cross-reference in calculating his Guidelines range. We reject both arguments and AFFIRM.

I

On May 9, 2023, Wilson and two friends met D.J. in a Valero gas station parking lot to purchase a firearm for $300.[1] As they left, they discovered the firearm was fake. Angered, Wilson drew a Palmetto State Armory Dagger pistol outfitted with a Glock switch—a device that converts a semiautomatic handgun into a fully automatic weapon—and retrieved an extended magazine capable of holding 31 rounds from his vehicle. The three men then walked to the rear of the station to confront D.J. After a brief exchange, Wilson fired multiple rounds, striking D.J. repeatedly until he fell. Wilson and his friends then robbed D.J. of cash and a gun before fleeing.

Investigators arrived soon after and found D.J. lying in the parking lot in a pool of blood. They transported him to a nearby hospital, where he was later pronounced dead. Officers interviewed a witness to the shooting and secured surveillance footage of the incident. They then located Wilson, who admitted firing the shots but claimed he acted in self-defense. Wilson also confirmed that the firearm he used was equipped with a "machinegun conversion device" and described it as a "tactical Glock."

Wilson was charged with unlawful possession of a machinegun, in violation of 18 U.S.C. § 922(o). He moved to dismiss the indictment, arguing

---

[1] These facts are taken from the Presentence Investigation Report, which was adopted by the district court with three clarifications requested by Wilson.

No. 24-10633

that § 922(o) violates the Second Amendment, but the district court denied the motion. Wilson then pleaded guilty without a written plea agreement.

Wilson's Presentence Investigation Report (PSR) identified U.S.S.G. § 2K2.1 as the applicable Guideline. Because the offense resulted in a death, the PSR applied the cross-reference to § 2A1, which governs homicide. The PSR determined that § 2A1.2—second-degree murder—was the most analogous offense. Applying that cross-reference, and incorporating other adjustments, the PSR calculated an offense level of 35. Combined with Wilson's criminal history, this produced a Guidelines range of 188–235 months' imprisonment. But because § 922(o) carries a statutory maximum of 10 years—below the Guidelines range—the PSR recommended a 120-month sentence.

Wilson objected, arguing that the second-degree murder cross-reference failed to account for his self-defense claim. The district court overruled Wilson's objection, adopted the PSR's findings, and imposed a 120-month sentence.

## II

We review preserved constitutional challenges de novo[2] and unpreserved sentencing objections for plain error.[3] To establish plain error, a defendant must show "(1) error, (2) that is plain, and (3) that affects substantial rights."[4] If the defendant makes that showing, we may exercise our discretion "to notice a forfeited error but only if (4) the error seriously

---

[2] *United States v. Diaz*, 116 F.4th 458, 462 (5th Cir. 2024).

[3] *United States v. Martinez-Rodriguez*, 821 F.3d 659, 662 (5th Cir. 2016).

[4] *Id.* (citation omitted).

No. 24-10633

affects the fairness, integrity, or public reputation of judicial proceedings."[5] "Meeting all four prongs is difficult, 'as it should be.'"[6]

## III

Wilson presses two arguments on appeal. First, he argues that his conviction is unconstitutional because § 922(o) violates the Second Amendment. Second, he contends that the district court erred by applying the Guidelines cross-reference to second-degree murder instead of voluntary manslaughter, which produced a higher Guidelines range. We take each argument in turn.

## A

We begin with Wilson's Second Amendment challenge.

Section 922(o) makes it unlawful—with exceptions not relevant here—"for any person to transfer or possess a machinegun." Wilson contends that this ban violates the Second Amendment's guarantee of an individual right to keep and bear arms.[7]

---

[5] *Id.* at 663.

[6] *Puckett v. United States*, 556 U.S. 129, 135 (2009) (citing *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004)).

[7] Wilson claims to bring both a facial and as-applied constitutional challenge. But his arguments collapse into one. His as-applied challenge alleges that § 922(o) is unconstitutional "as applied to the possession of machineguns." But machinegun possession is all the statute prohibits. Indeed, Wilson's arguments focus exclusively on whether the government may facially ban machineguns; he never suggests that the statute is only unconstitutional as applied to his specific conduct. *See United States v. Morgan*, 147 F.4th 522, 526 (5th Cir. 2025) ("An as-applied challenge asks whether a law—though constitutional in some circumstances—is nonetheless unconstitutional as applied to a defendant's activity." (cleaned up)).

No. 24-10633

This is not an issue of first impression for us. In *Hollis v. Lynch*, we rejected a constitutional challenge to § 922(o) and held that machineguns "do not receive Second Amendment protection."[8] And under our rule of orderliness, "one panel of our court may not overturn another panel's decision."[9] Because Wilson offers no reason to depart from that rule, *Hollis* remains binding precedent.

1

We begin with an overview of *Hollis*. Eight years after the Supreme Court decided *District of Columbia v. Heller*,[10] the panel in *Hollis* was asked to apply that landmark decision to § 922(o)'s ban on machinegun possession.

*Hollis* distilled three guiding principles from *Heller*. First, the Second Amendment protects only weapons that are "in common use at the time," and "[i]f a weapon is dangerous and unusual, it is not in common use."[11] Second, the Court "took it as a given that M-16s are dangerous and unusual weapons and not protected by the Second Amendment."[12] And third, even though today's ordinary military weapons far outpace those typically kept at home for defense, that "cannot change our interpretation of the right."[13]

Guided by these principles, *Hollis* concluded that machineguns are not in "common use" and thus fall outside the Second Amendment. It emphasized that "both the *Heller* majority and dissent identified the M-16 to

---

[8] 827 F.3d 436, 451 (5th Cir. 2016).

[9] *Acosta v. Hensel Phelps Construction Co.*, 909 F.3d 723, 742 (5th Cir. 2018) (cleaned up).

[10] 554 U.S. 570 (2008).

[11] *Hollis*, 827 F.3d at 446 (citing *Heller*, 554 U.S. at 627).

[12] *Id.*

[13] *Id.* (citing *Heller*, 554 U.S. at 627–28).

No. 24-10633

be a dangerous and unusual weapon." [14] Although recognizing that these passages from *Heller* were dicta, *Hollis* observed that "we are generally bound by Supreme Court dicta, especially when it is 'recent and detailed.'" [15] Still, because this was ultimately dicta, *Hollis* undertook an "independent inquiry" into whether machineguns are in fact "in common use"—that is, whether they are dangerous and unusual. [16]

*Hollis* had little difficulty concluding that "machineguns are dangerous weapons." [17] On unusualness, it noted the "wide variety in methodological approaches" other courts use to distinguish "common from uncommon." [18] Yet under any approach, the result was the same: "it does not matter which set of numbers we adopt . . . [n]one of them allow a conclusion that a machinegun is a usual weapon." [19] *Hollis* pointed to the raw number of pre-1986 civilian-owned machineguns—175,977—as far below what other circuits had deemed sufficient to "show[] common use." [20] It distinguished that number from the 200,000 stun guns two Justices had deemed enough to render stun guns "common," noting that while stun guns were lawful in 45 states, machineguns were totally banned in 34 states and heavily restricted in

---

[14] *Id.* at 447.

[15] *Id.* at 448 (citing *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013)).

[16] *Id.*

[17] *Id.*

[18] *Id.* at 449 (quotation omitted).

[19] *Id.*

[20] *Id.* (noting that the Second Circuit found 50 million large-capacity magazines sufficient for a showing of common use, and that the Fourth Circuit found the same for 8 million AR- and AK-platform semi-automatic rifles).

the rest.[21] *Hollis* also declined to perform a percentage analysis because the record contained no such data, though it observed "the percentages would be quite low."[22] Thus, "irrespective of the metric used," the numbers failed to establish that machineguns are usual.[23]

Declaring that "[m]achineguns are dangerous and unusual and therefore not in common use," *Hollis* concluded they fall outside the Second Amendment.[24]

2

Wilson asks us to set aside our rule of orderliness and ignore *Hollis*'s unmistakable holding because "175,000 is no longer a reasonable estimate of the number of machineguns in the country." He argues that, according to reports from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), there are roughly 740,000 registered machineguns, and when illegally owned machineguns are included, they "now likely number in the millions." That argument fails on several fronts.

Most straightforwardly, Wilson's numbers have no bearing on *Hollis*'s precedential force. Our caselaw is clear: the rule of orderliness applies unless a previous decision "is overruled, expressly or implicitly, by either the United States Supreme Court or by the Fifth Circuit sitting en banc."[25] Wilson cites no authority—neither in his briefs nor when directly

---

[21] *Id.* at 449–50 (discussing *Caetano v. Massachusetts*, 577 U.S. 411, 419–20 (2016) (ALITO, J., concurring)).

[22] *Id.* at 450.

[23] *Id.*

[24] *Id.* at 451.

[25] *Stewart v. Entergy Corp.*, 35 F.4th 930, 935 (5th Cir. 2022); *see also United States v. Alcantar*, 733 F.3d 143, 145 (5th Cir. 2013) ("Under our rule of orderliness, *only* an

questioned during oral argument—suggesting that we may disregard a panel decision based solely on evolving facts. If Wilson believes *Hollis* is factually outdated, his recourse is to seek en banc review.[26]

But even if we could revisit *Hollis*, Wilson's "updated" statistics are misleading at best. Recently published ATF data show that the 740,000 figure includes machineguns registered to state and local government entities as well as to licensed dealers selling exclusively to government agencies.[27] Those firearms are not in the hands of private citizens for the core lawful purpose of self-defense;[28] they are possessed by the government—not "possessed at home"—and are used primarily for law-enforcement purposes—not personal "self-defense."[29] Firearms held by police and military entities are irrelevant to the "common use" inquiry.

Fortunately, ATF data provides a more telling figure: about 234,718 machineguns "registered . . . [and] transferable to a private individual or between private individuals."[30] That number is far below Wilson's claimed

---

intervening change in the law (such as by a Supreme Court case) permits a subsequent panel to decline to follow a prior Fifth Circuit precedent." (emphasis added) (citation omitted)).

[26] *Gjetani v. Barr*, 968 F.3d 393, 397 n.2 (5th Cir. 2020) ("And of course, only our en banc court can overrule the decision of a prior panel unless such overruling is unequivocally directed by controlling Supreme Court precedent." (cleaned up)).

[27] *See* ATF.gov, *Data & Statistics, Machineguns Registered in the National Firearms Registration and Transfer Record*, https://www.atf.gov/resource-center/data-statistics.

[28] *Hollis*, 827 F.3d at 447 ("The Second Amendment protects the class of weapons that enable 'citizens to use them for the core lawful purpose of self-defense . . . .'" (quoting *Heller*, 554 U.S. at 630)).

[29] *Id.* (internal quotations and citation omitted).

[30] *See* ATF.gov, *Data & Statistics, Machineguns Registered in the National Firearms Registration and Transfer Record*, https://www.atf.gov/resource-center/data-statistics. Indeed, even this number may be too high. The ATF notes that "these machineguns may

No. 24-10633

740,000 and roughly matches the 175,000 figure cited in *Hollis*. So even on Wilson's own terms, there are no "new facts" warranting departure from *Hollis*.

Finally, even if Wilson's number were accurate, those figures would hardly alter *Hollis*'s outcome. *Hollis* understood *Heller* to identify machineguns as "the quintessential example" of unprotected arms and to treat "M-16s are dangerous and unusual weapons."[31] And while recognizing this as dicta, *Hollis* emphasized that "we are generally bound by Supreme Court dicta, especially when it is 'recent and detailed.'"[32] Thus, even apart from its independent inquiry into common use, *Hollis* had already anchored its holding in binding Supreme Court guidance.

In short, Wilson's "updated" statistics give us no license to disturb *Hollis*'s unambiguous holding: machineguns are not protected by the Second Amendment.

3

A second argument for ignoring *Hollis* rests on the claim that it was abrogated by *New York State Rifle & Pistol Association, Inc. v. Bruen*.[33] Unlike a change in facts, an intervening Supreme Court decision may permit one panel to depart from another—but only where "such overruling is unequivocally directed by controlling Supreme Court precedent."[34] As already discussed, *Hollis* held that machineguns are not covered by the

---

no longer function, or they may be actually possessed by government entities, licensed entities, or individuals outside of the United States." *Id.* (citations omitted).

[31] *Hollis*, 827 F.3d at 445–56.

[32] *Id.* at 448 (citing *Gearlds*, 709 F.3d at 452).

[33] 597 U.S. 1 (2022).

[34] *Martin v. Medtronic, Inc.*, 254 F.3d 573, 577 (5th Cir. 2001) (quotation omitted).

No. 24-10633

Second Amendment because they are dangerous and unusual, and therefore not in common use.[35] Nothing in *Bruen* "unequivocally" overrules that core holding.

On the contrary, *Bruen* reinforces the portion of *Heller* on which *Hollis* relied. In *Hollis*, the court cited dicta from *Heller* for the proposition that the Second Amendment does not protect dangerous and unusual weapons.[36] And in *Bruen*, the Supreme Court reiterated that portion of *Heller*, observing that it is "fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons that the Second Amendment protects the possession and use of weapons that are in common use at the time."[37] Far from abrogating *Hollis*, *Bruen* confirmed its major premise—that prohibitions on dangerous and unusual weapons are consistent with our historical tradition of firearm regulation. And because *Bruen* said nothing about the scope of that tradition, it did not displace *Hollis*'s minor premise—that § 922(o) is consistent with that historical tradition.

To be sure, *Bruen* modified the framework for analyzing Second Amendment challenges. Prior to *Bruen*, we employed a two-step inquiry:[38] first, whether a law impinged upon a right protected by the Second Amendment; and second, if so, whether the law survived "means-end scrutiny."[39] *Bruen* eliminated that second step but retained the first as "broadly consistent with *Heller*, which demands a test rooted in the Second

---

[35] *Hollis*, 827 F.3d at 451.

[36] *Id.* at 446 (citing *Heller*, 554 U.S. at 627).

[37] *Bruen*, 597 U.S. at 21 (internal quotation marks omitted) (quoting *Heller*, 554 U.S. at 627).

[38] *See id.* at 18; *Diaz*, 116 F.4th at 463.

[39] *Diaz*, 116 F.4th at 463.

No. 24-10633

Amendment's text, as informed by history."[40] Thus, while cases decided under the second step were categorically abrogated by *Bruen*, that does not mean that *Bruen* swept the entire slate clean. Rather, if a case decided under the first step does not conflict with *Bruen* in a more concrete way, we cannot say that it was unequivocally rejected by *Bruen*.

That conclusion is also consistent with our decision in *United States v. Diaz*.[41] True, *Diaz* stated that our circuit's pre-*Bruen* precedent was obsolete under the "new historical paradigm for analyzing Second Amendment claims."[42] But *Diaz* swept away only those cases that relied on means-end scrutiny. Indeed, when the government tried to salvage certain precedents by labeling them step-one cases, *Diaz* rejected the attempt—not because *Bruen* had wiped clean the entire universe of Second Amendment caselaw, but because those specific precedents were "based on the means-ends scrutiny that *Bruen* renounced."[43]

Not so with *Hollis*. *Hollis* was decided exclusively at step one—the step *Bruen* found "broadly consistent with *Heller*."[44] Relying directly on *Heller*'s historical analysis, *Hollis* explained "that a law that regulates a class of weapons that are not in common use will be upheld at step one."[45] *Hollis* never invoked—let alone relied upon—the now-discarded means-end scrutiny. It rested on *Heller*'s "dangerous and unusual weapons" language,

---

[40] *Bruen*, 597 U.S. at 19, 24.

[41] 116 F.4th 458.

[42] *Id.* at 465.

[43] *Id.*

[44] *Bruen*, 597 U.S. at 19.

[45] *Hollis*, 827 F.3d at 447; *see also id.* at 451 ("[W]e uphold Section 922(o) at step one of our framework.").

No. 24-10633

which *Bruen* reaffirmed. Therefore, overruling *Hollis* is not "unequivocally directed" by *Bruen*.[46]

The Sixth Circuit agrees. Facing a similar challenge, that court recently reaffirmed its precedent upholding § 922(o) under *Heller*,[47] holding that *Bruen* "did nothing to displace those aspects of *Heller* on which [its precedent] relied."[48] So too here: *Bruen* leaves *Hollis* intact.

\*       \*       \*

In sum, *Hollis* continues to bind us. And because *Hollis* controls, Wilson's Second Amendment challenge to his § 922(o) conviction must fail.

B

Wilson next argues that the district court applied the wrong cross-reference in calculating his Guidelines offense level. Wilson concedes that he did not preserve this objection, so plain-error review applies.[49] And under that standard, Wilson's challenge fails because he cannot show plain error.

---

[46] *Martin*, 254 F.3d at 577 (quotation omitted).

[47] *United States v. Bridges*, --- 150 F.4th ---, 2025 WL 2250109, at *4517, 522 (6th Cir. Aug. 7, 2025).

[48] *Id.*

[49] Wilson cites *United States v. Lopez*, 923 F.2d 47, 50 (5th Cir. 1991), for the proposition that "[c]loser scrutiny" of his unpreserved challenge is warranted because he objected to the cross-reference on related grounds—namely, that it failed to account for his self-defense claim. But *Lopez* ultimately applied the plain-error standard because the defendant "had ample opportunity to raise this matter below," "was at that time aware of all information the district court considered relevant to his sentence," "was also fully apprised of how the district court intended to apply the relevant guidelines to that information," and made "no attempt to excuse his failure to call this matter to the district court's attention." *Id.* at 50–51 (citation omitted). The same conditions are present here. Moreover, Wilson doesn't explain how his self-defense would have done anything to "alert the district court to the error of which he . . . complains on appeal." *United States v. Brooks*,

No. 24-10633

The Guidelines section for unlawful machinegun possession directs that if the defendant used the firearm in connection with another offense in which "death resulted," the district court should apply "the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide), if the resulting offense level is greater than that [for the instant offense]."[50] In doing so, district courts must "determine what federal homicide offense was most analogous to the conduct" of the defendant.[51]

Under federal law, murder "is the unlawful killing of a human being with malice aforethought."[52] A murder involving certain statutorily defined elements is considered first-degree murder, while "[a]ny other murder is murder in the second degree."[53] Voluntary manslaughter, by contrast, is the "unlawful killing of a human being without malice" but "[u]pon a sudden quarrel or heat of passion."[54] The difference between second-degree murder and voluntary manslaughter therefore "turns on whether the defendant committed the killing with 'malice' or with a reduced level of culpability."[55] And malice aforethought "encompasses three distinct mental states: (1)

---

33 F.4th 734, 739 (5th Cir. 2022) (cleaned up). Ordinary plain-error review is therefore the correct standard.

[50] U.S.S.G. § 2K2.1(c)(1)(B).

[51] *United States v. Hicks*, 389 F.3d 514, 530 (5th Cir. 2004).

[52] 18 U.S.C. § 1111(a).

[53] *Id.*

[54] 18 U.S.C. § 1112(a).

[55] *Hicks*, 389 F.3d at 530 (citing *United States v. Browner*, 889 F.2d 549, 551–52 (5th Cir. 1989)).

intent to kill; (2) intent to do serious bodily injury; and (3) extreme recklessness and wanton disregard for human life ('depraved heart')."[56]

The facts of this case, as described in the PSR and adopted by the district court, support a finding that Wilson acted with malice. After discovering that D.J. had sold him a fake firearm, Wilson drew his own handgun equipped with a machinegun conversion device, retrieved a 31-round magazine from his vehicle, walked to the back of the gas-station parking lot, confronted D.J., pointed the firearm directly at him, and fired multiple shots until D.J. fell. We have previously found similar facts sufficient to support a finding of second-degree murder.[57]

Indeed, Wilson does not meaningfully dispute that these facts align with second-degree murder. Instead, he seizes on a single sentence in the PSR: "When determining the applicable guideline for the cross reference, the details of D.J.'s murder indicates a 'crime of passion' in which the defendant acted against D.J. because of a sudden strong impulse such as anger with minimal planning and within a short period of time." Wilson highlights the phrases "crime of passion" and "sudden strong impulse," noting their similarity to the statutory language "heat of passion" and

_____

[56] *Id.* (quoting *Lara v. United States Parole Comm'n*, 990 F.2d 839, 841 (5th Cir. 1993)).

[57] *See id.* at 531 (finding second-degree murder when defendant intentionally fired his gun at a police cruiser, which he likely knew to be occupied); *United States v. White*, No. 23-10194, 2024 WL 4987350, at *5 (5th Cir. Dec. 5, 2024) (finding that "pointing a gun at someone and firing it shows a specific intent to kill") (unpublished), *cert. denied*, 145 S. Ct. 1910 (2025); *cf. United States v. Bell*, No. 23-50168, 2023 WL 7549508, at *1 (5th Cir. Nov. 13, 2023) (unpublished) (finding no error when the district court applied the cross-reference for attempted first-degree murder when the defendant, after getting in a physical altercation with his ex-girlfriend, "returned to the residence and began shooting a handgun in her general direction"); *Frascarelli v. U.S. Parole Comm'n*, 857 F.3d 701, 708 (5th Cir. 2017) (finding malice, in part, because the defendant walked down and up a flight of stairs to obtain a hammer, which showed "that the heat of passion had time to 'cool'").

"sudden quarrel" in the voluntary-manslaughter statute.[58] He then argues that because the district court adopted the PSR's findings—including this sentence—it "effectively found" that Wilson committed voluntary manslaughter and thus erred in applying the second-degree murder cross-reference.

Contrary to Wilson's claim that the district court "effectively found" voluntary manslaughter, the court expressly and unambiguously determined that the most analogous offense was second-degree murder. This is therefore not a case where the court found voluntary manslaughter but mistakenly applied the second-degree murder cross-reference—a scenario that could well amount to plain error. The real question here is whether the district court's conclusion that Wilson's conduct was most analogous to second-degree murder was unreasonable given its factual findings that D.J.'s killing involved a "crime of passion" and "sudden strong impulse."

It was not. True, those phrases evoke voluntary manslaughter. But they do not tell the whole story. Wilson overlooks that the district court adopted the PSR in its entirety, not just one sentence. And as explained above, the specific details of Wilson's conduct—arming himself with a machinegun-conversion device, retrieving a high-capacity magazine, confronting D.J., and firing multiple rounds—easily support second-degree murder. At most, the PSR is ambiguous: its general description evokes voluntary manslaughter, but its specifics point to second-degree murder. When the facts cut both ways, we cannot say the district court plainly erred in concluding that second-degree murder was the more analogous offense.[59]

---

[58] 18 U.S.C. § 1112(a).

[59] *Cf. United States v. Hebert*, 813 F.3d 551, 560 (5th Cir. 2015) ("'[U]nder clear error review, even '[w]here there are two permissible views of the evidence, the

No. 24-10633

Nor has Wilson cited any authority to the contrary.[60] Accordingly, the district court did not commit a "clear or obvious" error in applying the second-degree murder cross-reference.[61]

Because Wilson has not shown plain error, we need not address the remaining prongs of plain-error review.[62]

## IV

In conclusion, both of Wilson's arguments fail. The district court did not err in rejecting Wilson's Second Amendment challenge to § 922(o) or in its application of the second-degree murder cross-reference.

Accordingly, we AFFIRM the district court's judgment.

---

factfinder's choice between them cannot be clearly erroneous.'" (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)).

[60] *United States v. McGavitt*, 28 F.4th 571, 577 (5th Cir. 2022) ("In this circuit, a lack of binding authority is often dispositive in the plain error context." (quotation marks and citation omitted)); *see also United States v. Lainez Garcia*, No. 22-40455, 2023 WL 2733473, at *2 (5th Cir. Mar. 31, 2023) (unpublished) ("And without on-point, binding precedent, the defendant normally cannot show that an error was plain." (citation omitted)).

[61] *Puckett*, 556 U.S. at 135.

[62] *United States v. Russell*, 136 F.4th 606, 609 n.4 (5th Cir. 2025).

Don R. Willett, *Circuit Judge*, concurring:

The Constitution's enduring genius lies less in its promises than in its design. As Justice Scalia once reminded a Senate committee, even the most oppressive regimes profess liberty, but only a government of divided powers can give life to parchment guarantees.[1] That design—the Constitution's Madisonian architecture of separated powers, divided sovereignty, and enumerated authority—was shrewdly crafted to restrain government even as it empowers it. And each generation must decide whether to honor those structural limits as boundaries to uphold—or to treat them as obstacles to outwit.

The Framers understood those limits not as impediments to progress but as the architecture of freedom itself—liberty's scaffolding, built to confine power within its rightful bounds. That insight remains the lifeblood of our constitutional order, the reason ours endures as the oldest written national constitution on earth. And nowhere is fidelity to that design more vital than in the criminal sphere, where the consequences of unbounded power are most acute, and where federal authority must both begin and end with enumerated power.

Congress's power to define and punish crimes—like all federal authority—must therefore rest on a specific constitutional grant. Not every act that may be rightly condemned may also be federally criminalized. The statute before us, 18 U.S.C. § 922(o), brings that principle into sharp relief. It embodies the perennial tension between legitimate national aims and the

---

[1] *Considering the Role of Judges Under the Constitution of the United States: Hearing Before the S. Comm. on the Judiciary*, 112th Cong. 6 (2011) (statement of Hon. Antonin Scalia, Assoc. Just., Sup. Ct. of the U.S.) ("[I]f you think that the Bill of Rights is what sets us apart, you are crazy. Every banana republic has a bill of rights. Every president for life has a bill of rights.").

Constitution's structural restraints, and it requires us to ask whether, in the name of public safety, Congress has remained within its enumerated bounds—or pressed beyond them.

## I. Constitutional Restraints on Federal Criminal Law

Two hundred and fifty years ago, the Continental Congress approved the great charter of American independence. It proclaimed that "certain unalienable Rights" flow from the "Creator," and that government's purpose is "to secure these rights."[2] A decade later, in 1787 and 1788, "We the People" ratified the great charter of American union, establishing a system of government anchored by four interlocking mechanisms designed to secure those rights: representative government, separation of powers, federalism, and—eventually—a Bill of Rights.[3]

These foundational pillars undergird three bedrock principles of federal criminal law. First, representative government and separation of powers together dictate that only Congress—not the Executive and not the

---

[2] The Declaration of Independence para. 2 (U.S. 1776).

[3] *See* Frederick Douglass, The Life and Times of Frederick Douglass 333 (John Lobb ed., 1882) (describing "the elective franchise as the one great power by which all civil rights are obtained, enjoyed, and maintained under our form of government"); *Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 75 (2015) (Thomas, J., concurring in the judgment) ("At the center of the Framers' dedication to the separation of powers was individual liberty." (citation omitted)); *Gregory v. Ashcroft*, 501 U.S. 452, 459 (1991) ("In the tension between federal and state power lies the promise of liberty."); *United States v. Guest*, 383 U.S. 745, 771 (1966) (Harlan, J., concurring in part and dissenting in part) (noting that the Bill of Rights was "designed to protect personal liberties"); *cf. United States v. Rahimi*, 602 U.S. 680, 777 (2024) (Thomas, J., dissenting) ("The Framers and ratifying public understood that the right to keep and bear arms was essential to the preservation of liberty." (cleaned up)).

Judiciary—may define conduct as criminal.[4] Second, federalism requires that every federal criminal statute "rest on one of Congress's 'few and defined' powers."[5] And third, the Bill of Rights forbids any federal law—including a criminal statute—from transgressing protected individual rights.[6]

## II. The Machinegun Ban & The Commerce Power

Jamaion Wilson challenges 18 U.S.C. § 922(o)—the federal machinegun ban—under only the last of these principles. As the majority explains, that challenge is foreclosed by our decision in *Hollis v. Lynch*.[7] I write separately to express concern that § 922(o) may also be inconsistent with the second tenet of federal criminal law: the Constitution's principle of enumerated powers.

That principle—no less than the explicit prohibitions in the Bill of Rights—is essential to the preservation of liberty.[8] "Congress has no power

---

[4] *See, e.g., Bousley v. United States*, 523 U.S. 614, 620–21 (1998) ("[I]t is only Congress, and not the courts, which can make conduct criminal." (citations omitted)); *United States v. Hudson*, 11 U.S. (7 Cranch) 32 (1812) (holding that federal courts lack common-law criminal jurisdiction); *see also United States v. Pheasant*, 157 F.4th 1119, 1120 (9th Cir. 2025) (Bumatay, J., dissenting from the denial of rehearing en banc) ("[T]o satisfy the non-delegation doctrine that our separation of powers demands, Congress must—at a minimum—define both the actus reus and the penalty for any criminal offense.").

[5] *United States v. Bonner*, 159 F.4th 338, 340 (5th Cir. 2025) (Willett, J., concurring) (quoting The Federalist No. 45, at 292 (James Madison) (Clinton Rossiter ed., 1961)).

[6] *See id.* ("Like all congressional enactments, federal criminal statutes must . . . respect the many constitutional provisions that secure individual rights against government intrusion.").

[7] 827 F.3d 436 (5th Cir. 2016); *see supra*, at 5.

[8] *See, e.g., Gregory*, 501 U.S. at 459; *Bond v. United States*, 564 U.S. 211, 222 (2011) ("[F]ederalism protects the liberty of the individual from arbitrary power."); *Reynolds v. Sims*, 377 U.S. 533, 625 (1964) (Harlan, J., dissenting) ("The Constitution is an

to enact a comprehensive criminal code,"[9] and thus § 922(o), like every other federal statute, "must be based on one or more of [Congress's] powers enumerated in the Constitution."[10]

Because the commerce power has been interpreted so expansively, the natural first place to look is the Interstate Commerce Clause[11]—perhaps in concert with the Necessary and Proper Clause.[12] The power "[t]o regulate Commerce . . . among the several States,"[13] the Supreme Court has explained, is not—contrary to what one might expect—"confined to the regulation of commerce among the states."[14] But neither is it boundless. The Court has "identified three general categories of regulation in which Congress is authorized to engage under its commerce power. First, Congress can regulate the *channels* of interstate commerce. Second, Congress has authority to regulate and protect the *instrumentalities* of interstate commerce,

---

instrument of government, fundamental to which is the premise that in a diffusion of governmental authority lies the greatest promise that this Nation will realize liberty for all its citizens."); *Ex parte Siebold*, 100 U.S. (10 Otto) 371, 394 (1879) ("State rights and the rights of the United States should be equally respected. Both are essential to the preservation of our liberties . . . .").

[9] *Bonner*, 159 F.4th at 340 (WILLETT, J., concurring).

[10] *United States v. Morrison*, 529 U.S. 598, 607 (2000).

[11] U.S. CONST. art. I, § 8, cl. 3 ("The Congress shall have Power . . . [t]o regulate Commerce . . . among the several States . . . .").

[12] *Id.* art. I, § 8, cl. 18 ("The Congress shall have Power . . . [t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing powers . . . .").

[13] *Id.* art. I, § 8, cl. 3.

[14] *United States v. Darby*, 312 U.S. 100, 118 (1941).

and persons or things in interstate commerce. Third, Congress has the power to regulate activities that *substantially affect* interstate commerce."[15]

"Mere possession of a firearm fits uneasily within any of these categories."[16] Nor does the fact that the firearm happens to be a machinegun make a regulation of simple possession any more compatible with them.[17] Section 922(o), in fact, has been described as "a clone"[18] and "the closest extant relative"[19] of the provision invalidated in *United States v. Lopez*.[20] "Both are criminal statutes that regulate the purely intrastate possession of firearms."[21] Both "lack a jurisdictional element, that is, they do not require federal prosecutors to prove that the firearms were possessed in or affecting interstate commerce."[22] And in enacting both laws, "Congress made no findings regarding the link between the intrastate activity regulated by these laws and interstate commerce."[23]

---

[15] *Gonzales v. Raich*, 545 U.S. 1, 16–17 (2005) (emphasis added) (internal citations omitted).

[16] *Bonner*, 159 F.4th at 341 (WILLETT, J., concurring).

[17] *See United States v. Kirk*, 105 F.3d 997, 1010–16 (5th Cir. 1997) (separate opinion of JONES, J.); *United States v. Rybar*, 103 F.3d 273, 287–94 (3d Cir. 1996) (ALITO, J., dissenting).

[18] *Kirk*, 105 F.3d at 1010 (separate opinion of JONES, J.).

[19] *Rybar*, 103 F.3d at 287 (ALITO, J., dissenting).

[20] 514 U.S. 549 (1995).

[21] *Rybar*, 103 F.3d at 287 (ALITO, J., dissenting).

[22] *Id.*; *see also Kirk*, 105 F.3d at 1013 (separate opinion of JONES, J.) ("In comparison to § 922(o), which lacks any reference to interstate commerce, Congress specifically tied other regulations enacted concurrently with § 922(o) to interstate commerce."); *United States v. Branch*, 91 F.3d 699, 711 (5th Cir. 1996) ("There is no requirement that the machinegun have been in interstate commerce.").

[23] *Rybar*, 103 F.3d at 287 (ALITO, J., dissenting).

III.  *Knutson*'s Expansive Logic & The States' Role

Nevertheless, nearly thirty years ago, we upheld § 922(o) in *United States v. Knutson*.[24] In a brief per curiam opinion, we concluded that § 922(o) validly regulated activities with a substantial effect on interstate commerce.[25] The *Knutson* court pointed to "the federal government's longstanding record of regulating machineguns," which it believed reflected a "historic federal interest in the regulation of machine guns."[26]

*Knutson*'s logic, however, has no limiting principle. The two prior regulations on which it relied—a tax on machineguns and a licensing regime for federal firearms dealers[27]—cannot bear the constitutional weight placed upon them. Under modern doctrine, Congress's taxing power is not subject to pretext review, allowing it to regulate indirectly on virtually *any* subject.[28]

---

[24] 113 F.3d 27 (1997) (per curiam).

[25] *Id.* at 30–31.

[26] *Id.* (quoting *United States v. Kenney*, 91 F.3d 884, 890–91 (7th Cir. 1996)). The *Knutson* court also suggested that "[i]t is obvious 'to the naked eye' that the transfer and possession of machineguns has a substantial effect on interstate commerce." *Id.* at 30. Yet the court deemed it unnecessary to "delve into" such "considerations," relying instead on the "extensive legislative histories that accompanied each prior incarnation of what has been a durable line of federal machinegun regulations." *Id.*

But it is difficult to see how a substantial commercial effect from mere possession of a machinegun is "obvious to the naked eye"—unless one means to aggregate the effects of all such possession nationwide. As I have previously explained, however, aggregation is misplaced in this context because firearm possession is not an economic activity. *Bonner*, 159 F.4th at 342 (Willett, J., concurring).

[27] *See Knutson*, 113 F.3d at 30–31.

[28] *See Sonzinsky v. United States*, 300 U.S. 506, 513–14 (1937) ("[I]t has long been established that an Act of Congress which on its face purports to be an exercise of the taxing power is not any the less so because the tax . . . tends to restrict or suppress the thing taxed. Inquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is beyond the competency of the courts." (internal citations omitted)).

And courts routinely uphold regulations of those engaged in interstate commerce even when the rule also sweeps in *intra*-state economic activity.[29] Taken together, these premises mean that, under *Knutson*'s reasoning, there is no subject beyond Congress' reach—so long as it proceeds step by step: first taxing, then licensing, then prohibiting outright. But far from viewing this sort of incremental, frog-boiling expansion of federal power as legitimate, the Founding generation saw it as the more insidious threat—a quiet, gradual erosion of liberty rather than a sudden seizure of it.[30]

Even if Congress lacks the power to criminalize machinegun possession, it does not follow that *no one* possesses that authority. The Constitution draws that line clearly: while "[t]he powers delegated . . . to the federal government are few and defined," those "remain[ing] in the State governments are numerous and indefinite."[31] Indeed, thirty-four states have exercised those "numerous and indefinite"[32] powers to prohibit machinegun

---

[29] *See Darby*, 312 US. at 121 (collecting cases).

[30] *See, e.g.*, Federal Farmer, Letter X (Jan. 7, 1788), *reprinted in* 2 The Complete Anti-Federalist 281, 285 (Herbert J. Storing ed., 1981) ("It is not supposed that congress will act the tyrant immediately, and in the face of the day light. It is not supposed congress will adopt important measures, without plausible pretences, especially those which may tend to alarm or produce opposition. . . . [P]robably, they will be wise enough never to alarm, but gradually prepare the minds of the people for one specious change after another, till the final object shall be obtained."); Brutus, Essay XV (Mar. 20, 1788), *reprinted in* 2 The Complete Anti-Federalist, *supra*, at 441 (expressing concern that the Judiciary "will be able to extend the limits of the general government gradually, and by insensible degrees"); *see also* Centinel, Letter VIII (Dec. 27, 1787), *reprinted in* 2 The Complete Anti-Federalist, *supra*, at 177 (describing "attack[ing] the citadel of liberty by sap, and gradually undermin[ing] its outworks" as "the refined policy of successful despots"); *cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring) (noting the "[v]ast accretions of federal power, eroded from that reserved by the States").

[31] The Federalist No. 45, *supra*, at 292.

[32] *Id.*

possession.[33] Of course, such regulations must still comport with the Second Amendment.[34] But as the majority notes, *Hollis* remains good law—holding that a ban on machinegun possession is consistent with the Second Amendment.[35] Under *Hollis*, then, the states remain free to enforce their own machinegun bans, even if Congress may not.

IV.   A Call for Reconsideration—But Not in This Case

Shortly after *Lopez*—but before *Knutson*—we granted en banc review to consider whether § 922(o) is a valid exercise of Congress's commerce power. But we divided evenly, leaving the question unresolved.[36]

In an appropriate case, I would be open to revisiting *Knutson* en banc. But because Wilson did not raise an enumerated-powers challenge, this is not that case. For now, I simply note my doubts about *Knutson*'s reasoning and result.

---

[33] *Hollis*, 827 F.3d at 450.

[34] *See McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010) (plurality opinion) (holding that the right to bear arms applies to the states via the Fourteenth Amendment).

[35] *Supra*, at 5.

[36] *See Kirk*, 105 F.3d 998 (per curiam).

No. 24-10633

James C. Ho, *Circuit Judge*, dubitante:

The same Second Amendment issue that the panel majority decides today was previously argued before our court in an earlier case before a different panel. *See Sealed Appellee v. Sealed Juvenile*, No. 24-60348 (argued Apr. 28, 2025). And when that happens—when the same legal issue is presented to two different panels of our court—we typically defer to the first panel as a matter of court practice, if not common sense.

Here, however, the *Sealed Appellee* panel did precisely the opposite. On December 3, 2025, that panel placed their (earlier) case in abeyance, pending decision in our (later) case.

I don't intend to question or criticize that abeyance decision. But it is unexpected. And I don't wish to delay this case further. With *Sealed Appellee* now in abeyance, this case becomes the oldest pending appeal on our criminal docket.

To avoid further delay, I am content to simply await a petition for rehearing en banc. After all, the panel majority acknowledges that the Second Amendment issue presented here can ultimately be resolved by having our en banc court revisit *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016). And there's good reason for concern that our precedent misapplies the "dangerous and unusual" test. *See*, *e.g.*, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 47 (2022) (noting that weapons which were once "dangerous and unusual" can cease to be so). I also share the federalism concerns expressed by the concurring opinion, as I noted in *United States v. Seekins*, 52 F.4th 988, 988 (5th Cir. 2022) (Ho, J., dissenting from the denial of rehearing en banc).